**CITY OF ST. GEORGE, Plaintiff and Appellee,**

v.

**Brent Allen TURNER, Defendant and Appellant.**

No. 890620–CA.

Court of Appeals of Utah.

June 6, 1991.

Michael P. Zaccheo (argued), Salt Lake City, Alan B. Boyack, St. George, for defendant and appellant.

T.M. Shumway (argued), St. George City Atty., St. George, for plaintiff and appellee.

Before GARFF, JACKSON and ORME, JJ.

## OPINION

GARFF, Judge:

### INTRODUCTION

Appellant, Brent Allen Turner, appeals his conviction of displaying an obscene picture depicting sexual conduct in violation of St. George City Ordinance No. 2–77–2. We reverse.

### FACTS

Turner operated a retail business in St. George, Utah, vending hard rock record albums and T-shirts. Turner's small, signless store was open during evening hours only. He was charged with violating the St. George obscenity ordinance for his display of three painted bed sheets which he used as wall hangings and which were visible to anyone entering the shop.

Several people made their "artistic" contributions to the sheets as they hung on the wall. The sheets appear to be a collage consisting of various drawings and slogans in different sizes and styles. The paint appears to have been sprayed or brushed on. The pictures and slogans appear crude and simplistic. Several factors make some of the slogans and drawings impossible to discern from the record: the quality of the photographs in the exhibit, the draping of the sheets, and the fact that some stereo speakers appear in front of the sheets in the photographs. The slogans and drawings appear intended to confront and to offend, and are related to sexual, political, religious, and social themes.[1] The portion of the wall hangings that the prosecution claims violates the St. George ordinance supposedly portrays a woman reclining in a spread-eagled manner so as to expose her "pubic area," represented by three or four black paint spots. The face and head of the figure could conceivably be that of a dog. Next to the drawing of the woman is what has been represented to be an enlarged drawing of a woman's pubic area. Both renditions are crudely drawn, blurry and indistinct. The quality of the renderings could best be compared to the graffiti and drawings frequently found on the walls of a junior high school rest room.[2]

Turner was charged with violating St. George City Obscenity Ordinance No. 2–77–2 §§ 2a(1) and (2). The relevant portions of this lengthy ordinance are as follows:

No person shall knowingly: (1) Distribute, display publicly, furnish or provide to any person any obscene material or performance.

St. George, Utah, Ord. No. 2–77–2, § 2a(1). "Obscene" is defined as

any material or performance which, when taken as a whole and considered in the context of the contemporary standards of this community:

(1) Appeals to prurient interest in sex;

---

1. The slogans include "Nuke My Ass," "Your [sic] Afraid Face it," "Group Sex," "Total Peace," "Fuck Authority," "Burn the Dead," "Eat It," "Live–Die Airborne," "Hell House," "Kill for God," "Run and Hide Death Will Find You!," "Sold Your Soul," "White Flys [sic] Will Eat Your Flesh," "The End," "And Unto You I Dedicate My Heart," and "My Right to The World." The drawings include a peace symbol, an MX missile, a swastika, some gravestones, some crosses, some international prohibitive symbols over the words "life" and "drugs," a smiling face, a gun, several skulls, some with cross bones, some with full skeletons, a door, a mushroom cloud, and a moon.

2. The dissent's description of the two drawings gives the impression one is looking at an explicit medical illustration from *Gray's Anatomy*, or viewing an exact photograph of the area in question, leaving no room for dispute as to what the renditions depict. Such is simply not the case. The second drawing, described in such intimate detail, could just as easily be viewed as a beetle, a leaf, or a Zulu war shield. Or it might more closely resemble a fugitive ink blot from the Rorschach test ("A personality and intelligence test in which a subject interprets ten standard black or colored inkblot designs and reveals through his selectivity the manner in which intellectual and emotional factors are integrated in his perception of environmental stimuli." Webster's *Medical Desk Dictionary* (1986)). Because the drawings were sufficiently abstract so as to permit a variety of nonobscene interpretations, and because of the other reasons enumerated later in this opinion, the judge, as a matter of law, should have never permitted the issue to go to the jury.

(2) Portrays sexual conduct in a patently offensive manner;

(3) Has no serious literary, artistic, political or scientific value.

St. George, Utah, Ord. No. 2–77–2, § 1a. The ordinance provides a lengthy definition of "sexual conduct," the relevant portion of which is as follows:

(2) Masturbation, excretion, excretory function or lewd exhibition of the genitals, including any *explicit* close-up representation of a human genital organ or a spread eagle exposure of female genital organs.

St. George, Utah, Ord. No. 2–77–2, § 1e (emphasis added).

A jury found Turner guilty. He now appeals his conviction on the grounds that (1) the obscenity ordinance was unconstitutional as applied to him, and (2) the ordinance is unconstitutionally vague and overbroad.

## FIRST AMENDMENT

In a case where we are required to weigh important first amendment values of freedom of speech against a charge of obscenity based on a statute or ordinance that is properly limited, we exercise independent review when necessary, and determine, as a matter of constitutional law, whether the material is to be protected. *Jenkins v. Georgia*, 418 U.S. 153, 160, 94 S.Ct. 2750, 2755, 41 L.Ed.2d 642 (1974).[3]

In *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), the United States Supreme Court set forth its definition of obscenity. The standard has been elaborated in subsequent cases,[4] and it remains the standard for distinguishing between speech, which is protected by the First Amendment of the United States Constitution, and obscenity, which is not considered speech and receives *no such protection. Id.* at 23, 93 S.Ct. at 2614; *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 54, 93 S.Ct. 2628, 2633, 37 L.Ed.2d 446 (1973); *Roth v. United States*, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957).[5]

The *Miller* test is as follows:

The basic guidelines for the trier of fact must be: (a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

413 U.S. at 24, 93 S.Ct. at 2615 (quotations and citations omitted). The *Miller* test is basically incorporated into the St. George ordinance, except that the ordinance defines "sexual conduct" in ways not specifically mentioned in *Miller*. Specifically, the St. George ordinance prohibits the display of "any explicit close-up representation of ... a spread eagle exposure of female genital organs." St. George, Utah, Ord. No. 2–77–2, § 1e. However, among the "plain

---

**3.** "[T]he First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary." *Jenkins*, 418 U.S. at 160, 94 S.Ct. at 2755 (quoting *Miller v. California*, 413 U.S. 15, 25, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973)). *See also, Jenkins*, 418 U.S. at 163–64, 94 S.Ct. at 2756 (Brennan, J. concurring).

**4.** For example, *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985) (elaboration of prurient interest); and *Jenkins*, 418 U.S. 153, 94 S.Ct. 2750 (elaboration of community standards).

**5.** The prosecution argues that, because the record shop is near a school and because mi-

nors are likely to frequent the shop, we should apply the lower standard suggested in *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975) (discussing content-neutral time, place and manner regulations of speech). However, the St. George ordinance fails to regulate the time, place, or manner that *sexually explicit material may be displayed*, but instead, it places a content-based restriction on any display of sexually explicit material. Consequently, we must apply the stricter test set forth in *Miller*, 413 U.S. 15, 93 S.Ct. 2607. Additionally, because the shop is unmarked and is only open evenings, when school is not in session, it does not appear that minors are especially likely to frequent the shop.

examples" given by the *Miller* court as to what a statute or ordinance can define for regulation as patently offensive sexual conduct was the "lewd exhibition of the genitals." *Miller,* 413 U.S. at 25, 93 S.Ct. at 2615. We find that, insofar as the definition describes materials that "depict or describe patently offensive 'hard core' sexual conduct" and insofar as that sexual conduct passes muster under the *Miller* test, which it must under section 1(a) of the ordinance, the ordinance is within constitutional limits.[6] *Jenkins,* 418 U.S. at 160, 94 S.Ct. at 2755 (quoting *Miller,* 413 U.S. at 27, 93 S.Ct. at 2616).

## PRURIENT INTEREST AND PATENTLY OFFENSIVE

The first prong of the *Miller* analysis requires the trier of fact to determine whether the " 'average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest." *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973) (quoting *Roth v. United States,* 354 U.S. 476, 489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498 (1957)).

Material that appeals to the prurient interest does not include "material that provoke[s] only normal, healthy sexual desires." *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 498, 105 S.Ct. 2794, 2799, 86 L.Ed.2d 894 (1985). Rather, it applies to material that provokes "sexual responses over and beyond those that would be characterized as normal." *Id.* Specifically, "prurience may be constitutionally defined for the purposes of identifying obscenity as that which appeals to a shameful or morbid interest in sex...." *Id.* at 504, 105 S.Ct. at 2802.

The second prong of the *Miller* analysis is "whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law." *Miller,* 413 U.S. at 24, 93 S.Ct. at 2615.

█ When determining what appeals to the prurient interest and what is patently offensive, the jury is not allowed unbridled discretion. *Jenkins v. Georgia,* 418 U.S. 153, 160, 94 S.Ct. 2750, 2755, 41 L.Ed.2d 642 (1974). The trial judge has a significant role in defining the extent of the jury's discretion. "Application of the obscenity standard involves a subjective element on the part of the tribunal—judge, jury or both—making the critical determination." *Huffman v. United States,* 470 F.2d 386, 397 (D.C.Cir.1971) (*rev'd on other grounds,* 502 F.2d 419 (D.C.Cir.1974)). In addition, jury discretion is subject to independent appellate review, when necessary, and by the requirement that only depictions of patently offensive hard core sexual conduct be subject to prosecution. *Jenkins,* 418 U.S. at 160, 94 S.Ct. at 2755. Therefore, in *Jenkins,* the Supreme Court did not hesitate to invade the province of the jury, which the Georgia Supreme Court had refused to do. In overturning the verdict, the Supreme Court ruled that the jury did not have sole discretion to determine that the film *Carnal Knowledge* was obscene, and substituted its judgment for that of the jury because, it concluded, it was "simply not the 'public portrayal of hard-core sexual conduct for its own sake, and for the ensuing commercial gain' which we said was punishable in *Miller.*" 418 U.S. at 162, 94 S.Ct. at 2756 (quoting *Miller,* 413 U.S. at 35, 93 S.Ct. at 2621). Thus, there is a constitutional threshold of "hard-coreness" that must be met.

█ Not only must the statute or ordinance be constitutionally explicit, but the trial court has the responsibility to make a threshold determination as to whether a work may depict hard-core sexual conduct. Only after the court has reached this conclusion is it appropriate to turn the matter over to the jury to apply the first two prongs of the *Miller* test.[7] Accordingly,

---

6. Because we reverse on other grounds, we do not consider whether the depiction at issue is lewd.

7. In a recent case, *State v. Ramirez,* 159 Utah Adv.Rep. 7, 9, ⸺ P.2d ⸺ (1991), the Utah

Supreme Court commented on the distinctions between the overlapping roles of the trial court and the jury. Even though *Ramirez* was concerned with the admission of eyewitness identification, we find the court's comments appropri-

we consider whether the trial court correctly made the threshold determination contemplated in *Jenkins.*[8] The court, in its pretrial order denying a motion to dismiss, found that "the words and drawing described herein arguably suggest an act which would constitute a violation of the ordinance, i.e., an act of oral-genital contact."

■ While the spray painted drawings depict representations of genitalia, the drawings are too crudely rendered to be salacious or titillating or to provoke sexual responses, normal or healthy, much less those that are "over and beyond those that would be characterized as normal." *Brockett,* 472 U.S. at 498, 105 S.Ct. at 2799. "Whatever else may be necessary to give rise to the States' broader power to prohibit obscene expression, such expression must be, in some significant way, erotic." *Cohen v. California,* 403 U.S. 15, 20, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971). The arresting officer admitted as much at trial. Even though the drawings are vulgar, offensive, and confrontational, they are too sketchy and abstract to appeal "to a shameful or morbid interest in sex."

*Brockett,* 472 U.S. at 504, 105 S.Ct. at 2802.[9] The trial court's pretrial finding of an "arguable suggestion" is not sufficient to meet the constitutional test, and our own review of the evidence leads us to the conclusion that, as a matter of law, these renderings are not "public portrayal[s] of hard-core sexual conduct for its own sake, and for the ensuing commercial gain." *Jenkins,* 418 U.S. at 161, 94 S.Ct. at 2755 (quoting *Miller,* 413 U.S. at 35, 93 S.Ct. at 2621).

Moreover, we cannot judge the drawings in isolation, but must also consider the written material and other symbols because *Miller* requires us to view the collage "taken as a whole" in determining its appeal to the prurient interest. 413 U.S. at 24, 93 S.Ct. at 2615. In *Kois v. Wisconsin,* 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972),[10] the Supreme Court considered the context in which an allegedly obscene work was displayed. *Kois* involved the publication of a photograph of an embracing nude couple, similar to one confiscated by a Wisconsin district attorney. Because the accompanying article was about the confisca-

---

ate here where the trial court has to make a preliminary determination of obscenity when that same issue will have to be redetermined by the jury when the evidence is considered:

> Potential for role confusion and for erosion of constitutional guarantees inheres in this overlap of responsibility of judge and jury to determine the same issue. Because the jury is not bound by the judge's preliminary factual determination made in ruling on admissibility[/obscenity] the trial court may be tempted to abdicate its charge as gatekeeper to carefully scrutinize proffered evidence for constitutional defects and may simply admit the evidence, leaving all questions pertinent to its reliability[/obscenity] to the jury. But courts cannot properly sidestep their responsibility to perform the required constitutional admissibility[/obscenity] analysis. To do so would leave protection of constitutional rights to the whim of a jury and would abandon the courts' responsibility to apply the law.

**8.** "Judges ... must take care lest they decide these cases on the basis simply of their indignation and disgust with the kind of trash presented. The First Amendment extends to trash, if it stops short of obscenity...." *Huffman,* 470 F.2d at 396. Even though a piece may be "dismally unpleasant, uncouth and tawdry," that

alone "is not enough to make [it] 'obscene.'" *Manual Enter. v. Day,* 370 U.S. 478, 490, 82 S.Ct. 1432, 1438, 8 L.Ed.2d 639 (1962).

**9.** "The First Amendment protection for the depiction of nude women applies even ... where the pictures focus upon the pubic areas and poses are struck in such a way as to emphasize the female genitalia." *Huffman,* 470 F.2d at 401.

**10.** Although *Kois* preceded *Miller, Miller* frequently cites the case with approval, indicating an intent to reaffirm the decision and its analysis. *Miller,* 413 U.S. at 23, 24, 25, 26, 35, 37, 93 S.Ct. at 2614, 2615, 2621, 2622. Also, the test in *Kois* was whether "to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." *Kois,* 408 U.S. at 230, 92 S.Ct. at 2246 (quoting *Roth v. United States,* 354 U.S. 476, 489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498 (1957)). Although this phrase implies that the *Kois* phrase "taken as a whole" applies only to the first part of the *Miller* test, the crux of *Kois* was whether an allegedly obscene depiction had political value. We think the *Kois* analysis of "taken as a whole" is helpful in both the first and third prongs of the *Miller* test.

tion, the Court held that the picture was newsworthy and thus protected. Laying a foundation for what would later be the third prong of the *Miller* analysis, the Court held that context could redeem an otherwise obscene picture where there is some contextual relativity between the offending portion and the rest of the work: "A quotation from Voltaire in the flyleaf of a book will not constitutionally redeem an otherwise obscene publication." 408 U.S. at 231, 92 S.Ct. at 2246. The Court held that because the picture was "rationally related" and "relevant to the theme of the article," it was "clearly entitled" to protection. *Id.*

Here, the two drawings do not appear as a sham attempt to insulate obscene material with protected material. That is, while the two drawings may be more confrontational and vulgar than what appears on the rest of the bedsheets, they are not entirely out of context with the other depictions of political, philosophical, musical, social and sexual themes. Because the work is a collage, there is not a close relationship among all the slogans and symbols. However, a close relationship is not the requirement; a rational relationship is. *Kois,* 408 U.S. at 231, 92 S.Ct. at 2246.[11]

The two drawings meet the *Kois* test because they rationally relate to the immediate context (the wall hangings) and to the broader context (the record store). The immediate context is a collage of various symbols and phrases. The broader context is that of a hard rock record store which vends heavy metal music, which music is intended, in part, to challenge traditional ideas and modes of thinking.

Therefore, even if we were to concede, which we do not, that the two key drawings appeal to the prurient interest and are patently offensive, we cannot see how the entire collage, taken as a whole, is so.

Because we conclude, as a matter of law, that the drawings themselves do not appeal to the prurient interest and are not patent-

ly offensive, and because the drawings rationally relate to the rest of the collage, which, taken as a whole, is not patently offensive and does not appeal to the prurient interest, we find that the drawings are not in violation of the St. George ordinance.

We therefore reverse the conviction.

ORME, J., concurs.

JACKSON, Judge (dissenting):

## INTRODUCTION

I would affirm Mr. Turner's conviction. He was tried by a jury of his peers and found guilty of violating an ordinance which specifically defined constitutionally obscene materials. Mr. Turner was provided fair notice that lewd exhibition of human genitals to the St. George public, including spread-eagle exposure of female genital organs, would bring prosecution. *Miller v. California,* 413 U.S. 15, 25, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973) provides "plain examples of what a state statute [or city ordinance] could define [as obscenity] for regulation...." One of *Miller*'s plain examples of "hard core" sexual conduct is representation of "lewd exhibition of the genitals." *Id.* Thus, the trial judge could reasonably determine that the ordinance contained a constitutionally proper and specific definition of obscenity and that Turner's exhibition of the nude spread-eagle female and a separate enlarged detailed vulva with open vagina, exposed labia and clitoris was in violation of the constitutionally valid ordinance. Accordingly, the trial judge properly submitted the case to the jury for determination after denying a pretrial motion to dismiss based only on submission of Turner's drawings and the city ordinance. The jury saw the materials, heard the evidence and determined that Turner's materials were obscene and that he had displayed them to unwarned mem-

11. The *Kois* Court's use of the phrase "rationally related" suggests a low level of integration between an offending picture and its larger context. *See* E. Main, *The Neglected Prong of the Miller Test for Obscenity: Serious Literary, Artistic, Political, or Scientific Value,* 11 S.Ill.Univ. L.J. 1159, 1163–64 (1987).

bers of the public in violation of the city ordinance.[1]

## FACTS

The statement of "facts" in the main opinion reads like a subjective treatise in art appreciation, assessing the quality of Turner's art work as "crude," "simplistic," "abstract," "indistinct" and "blurry." However, this attack of adjectives is irrelevant. The Supreme Court has not indicated that tasteful, mature, high quality obscenity should be suppressed or that untasteful, immature, low quality obscenity should go without regulation. On the other hand, the opinion does recognize that the "indistinct" drawing is in fact "a woman reclining in a spread-eagled manner (facing the viewer) so as to expose her pubic area." The opinion also recognizes the drawing next to the woman as a large depiction of a woman's pubic area but evaluates it as "blurry." These observations are highly relevant. This "blurry" drawing (in shades of red and pink) graphically depicts all of the external female genitalia. This vulva is surrounded by depictions of pubic hair done in black. "Genitalia," *the word in Miller and the St. George ordinance,* means the reproductive organs, especially the external sex organs. *The American Heritage Dictionary, Second College Edition* 553 (1985). Despite the majority's protestation in footnote 2 that Turner's depictions might resemble something else, Turner testified that they were a nude woman and an enlargement of a "girl's vagina."

Turner's vulva depiction occupies the center of the sheet (side to side) with the top of the vulva at the center of the sheet (top to bottom). On the lower half of the sheet, the left third is occupied by the words of a question with the nude woman underneath. The question done in black over yellow is:

"Why Not Let

Some One Else

Think For You?"

The upper half of the vulva and pubic hair depiction is immediately to the right of the three lines in the question. Between the question and the nude woman is: "Tuna Factory x x x x" inscribed in a green banner over her head. Between the nude woman and the vulva is a small sign post with the words "Tunnel of Love" and a yellow arrow points from the sign to the lower half of the vulva and pubic hair. Underneath the vulva and hair are the words "Keep Out" in red. To the right of the vulva and hair in black are the words:

"It's

Mine

All Mine"

The upper half of the sheet has these slogans across the top (left to right): "My Right to the World," "Your (sic) Afraid Face It" and "Live For Yourself" and a round bomb with "Drugs" inscribed on it. Underneath these items and across the lower portion of the upper half (left to right) are a skull, a swastika, a "13," a happy face, and a shield with "AA" on it.

## SCOPE OF APPELLATE REVIEW

The majority disposes of the jury's verdict by virtue of a "hard core" attack (without defining hard core) and by use of a "loose" definition of the scope of appellate review in mounting the attack. Their opinion, citing *Jenkins v. Georgia,* 418 U.S. 153, 160, 94 S.Ct. 2750, 2755, 41 L.Ed.2d 642 (1974), states that "the jury is not allowed unbridled discretion" in making its obscenity determination. Then the majority claims that *Jenkins* demonstrates that the appellate court should "not hesitate to invade the province of the jury" and to "substitute its judgment" for the jury's judgment because the jury "does not have sole discretion" to make the obscenity determination. I will first discuss scope of appellate review and then address the meaning of "hard core" and the "average person test" in response to the above posturing of the main opinion. Later in my opinion I will reach the main opinion's back-

---

1. Since Turner accepted the jury instructions "as constituted," no exceptions, I must conclude that the jury was properly instructed regarding applicable law.

up position regarding the context of Turner's work taken "as a whole."

I agree that the jury does not have unbridled discretion in an obscenity case. But I also note that my appellate colleagues do not have unbridled discretion on review. Our function is to restrict both the legal and factual determinations to the constitutional guidelines set forth in *Miller*. *Miller* states that the elements of obscenity—prurient interest, patent offensiveness and lack of serious value—are to be determined by the trier of fact, i.e., the jury. 413 U.S. at 26 & n. 9, 93 S.Ct. at 2616 & n. 9; *see also Smith v. United States*, 431 U.S. 291, 308, 97 S.Ct. 1756, 1767, 52 L.Ed.2d 324 (1977). Further, prurient interest and patent offensiveness are to be measured by the test of an average person in the community applying contemporary community standards, which I will discuss in detail below. Thus, we must give the jury's findings on those elements a fair measure of deference, particularly in a close case. That does not mean that obscenity convictions will be virtually unreviewable. *Smith*, 431 U.S. at 305, 97 S.Ct. at 1766. But, "[d]eterminations of prurient interest and patent offensiveness, and also, therefore, of contemporary community standards, are such as to indicate that the major determination should be made by the jury, except in the more extreme cases." F. Schauer, *The Law of Obscenity* at 150–51 (1976) (footnotes omitted) [hereinafter Schauer]. Since the serious value element is to be measured by a "reasonable person" standard, this determination is more amenable to appellate review. *See Smith*, 431 U.S. at 305, 97 S.Ct. at 1766.

[I]t is also significant to note the further indication of this decision [*Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) ] that although all of the elements of the Supreme Court's obscenity tests have a constitutional basis, only the [serious] value standard is really a question of fundamental consti-

tutional rights. *The other tests are mainly questions of fact requiring a less rigid standard of review.*

Schauer at 125[*] (emphasis added).

Because the majority fails to recognize the proper scope of appellate review, it answers the wrong question. Thus, the analysis quickly adopts a finding that Turner's "renderings are not public portrayals of hard core sexual conduct", i.e., the renderings are not obscene. Our function is not to answer the question of whether Turner's materials are obscene—as the majority has done. Our function is to answer the question of whether Turner's materials created a jury question as to obscenity—as the majority has not done.

The appellate court should review each *Miller* element and determine as to that element whether a jury issue has been created. Instead, the majority disposes of the jury's obscenity verdict by exercise of their own "hard core" judgment.

## A. The "Hard Core" Judgment

In *Huffman*, the United States Court of Appeals for the D.C. Circuit correctly observed that prior to 1971, the United States Supreme Court had not defined the term "hard core" pornography.[2] *Huffman v. United States*, 470 F.2d 386, 393 n. 9 (1971) *rev'd*, 502 F.2d 419 (D.C.Cir.1974). The Supreme Court did not define "hard core" until 1973 in *Miller* which set forth specific examples. If material which has failed to pass the *Miller* tests for obscenity looks like something different than *Miller*'s examples, then the jury or trial judge has erred in application of at least one of the tests. Schauer at 113. The main opinion relies on *Jenkins v. Georgia*, 418 U.S. 153, 162, 94 S.Ct. 2750, 2756, 41 L.Ed.2d 642 (1974), as the basis of its obscenity determination, holding that Turner's drawings do not depict *"hard core"* sexual conduct. But the opinion fails to examine the meaning of "hard core."[3] Thus, before exam-

**2.** The main opinion relies on *Huffman*, a pre-*Miller* and pre-*Jenkins* circuit case for language to support its "hard core" pornography argument. *See* nn. 7 & 8. Further, the opinion

utilizes *Huffman* to support its scope of review position.

**3.** *Miller* states that under its holding "no one will be subject to prosecution for the sale or

ining our case in the light of *Jenkins,* I turn to *Miller* for the definitive meaning of "hard core."

*Miller* states "for the first time since *Roth* [*v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498] was decided in 1957, a majority of this Court has agreed on *concrete guidelines* to isolate 'hard core' pornography from expression protected by the First Amendment." *Miller,* 413 U.S. at 29, 93 S.Ct. at 2617 (emphasis added). The *Miller* guidelines include concrete examples of "hard core" materials. One of those examples is "lewd exhibition of the genitals." *Id.* at 25, 93 S.Ct. at 2615. This example isolates as "hard core" the very materials described in the St. George ordinance and exhibited by Turner. His depictions and descriptions consist of genital imagery and sexual conduct. Since *Miller,* the depiction of sexual conduct does not necessarily require motion or activity.[4] *Jenkins* states that "we made it *plain* that under that holding [*Miller*] 'no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct....'" *Jenkins,* 418 U.S. at 160, 94 S.Ct. at 2755 (emphasis added) (quoting *Miller,* 413 U.S. at 27, 93 S.Ct. at 2616).

*Jenkins* reiterates the following definitions of "hard core" as first set forth in *Miller:*

> We also took pains in *Miller* to "give a few *plain* examples of what a state statute could define for regulation under

part (b) of the standard announced," that is, the requirement of patent offensiveness. *Id.,* at 25, 93 S.Ct., at 2615. These examples include "representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated," and "representations or descriptions of masturbation, excretory functions, and *lewd exhibition of the genitals." Ibid.* While this did not purport to be an exhaustive catalog of what juries might find patently offensive, *it was certainly intended to fix substantive constitutional limitations, deriving from the First Amendment, on the type of material subject to such a determination.* It would be wholly at odds with this aspect of Miller to uphold an obscenity conviction based upon a defendant's depiction of a woman with a *bare midriff,* even though a properly charged jury unanimously agreed on a verdict of guilty.

*Jenkins,* 418 U.S. at 160–61, 94 S.Ct. at 2755 (emphasis added). *Jenkins* was a "bare midriff" case. Our case is not. *Miller* does not mention bare midriffs or mere nudity. *Miller* specifically defines lewd exhibition of the "genitals." This is our case. In *Jenkins* the Supreme Court viewed the film *Carnal Knowledge* and observed:

> While the subject matter of the picture is, in a broader sense, sex, and there are scenes in which sexual conduct including "ultimate sexual acts" is to be understood to be taking place, the camera does not focus on the bodies of the actors at

---

exposure of obscene materials unless these materials *depict* or *describe* patently offensive 'hard core' sexual conduct specifically defined by the regulating state law...." *Miller,* 413 U.S. at 27, 93 S.Ct. at 2616. "Depict" means to present a lifelike image of. *Roget's II, The New Thesaurus* 246 (1980). "Describe" means to give a verbal account of. *Id.* at 250. Thus, "hard core" sexual conduct can be presented in images or words.

**4.** Professor Schauer has stated:
> In 1973, however, the Supreme Court specifically stated that only the depiction of "hard-core" sexual conduct may be prohibited. As examples of what might be included, the Court indicated the following:
> (a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.

> (b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.
> This definition seems to make it clear that hard-core pornography may include things other than actual sexual congress or activity, contrary to the views of a number of other courts prior to *Miller.* These views seemed based primarily on the *Redrup* [*v. New York,* 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967)] reversals of the Supreme Court, since for a number of years after 1967 the Court reversed any obscenity conviction where the material did not display actual sexual activity, regardless of the lewd or suggestive poses of individual models.
> Schauer at 111.

such times. *There is no exhibition whatever of the actors' genitals, lewd or otherwise, during these scenes. There are occasional scenes of nudity, but nudity alone is not enough to make material legally obscene under the Miller standards.*

*Id.* at 161, 94 S.Ct. at 2755 (emphasis added).

Having observed that the film depicted "nudity" only and not "genitals", the Supreme Court held that "the film could not, as a matter of constitutional law, be found to depict sexual conduct in a patently offensive way...." *Id.* at 161, 94 S.Ct. at 2755. *Jenkins* and *Miller* both tell us what can be defined as "hard core," i.e., lewd exhibition of the genitals. *Jenkins* tells us one thing that can not be considered "hard core," i.e., a bare midriff. *Jenkins* simply does not grant my colleagues discretion on review to hold as a matter of constitutional law that Turner's depictions and exhibition of female genitalia were clearly not obscene and did not create an issue for the jury. To the contrary, *Jenkins* and *Miller* stand for the proposition that St. George could define, and prohibit as "hard core" obscenity, the lewd exhibition of the genitals—even if only by "representation." *Miller,* 413 U.S. at 25, 93 S.Ct. at 2615. The St. George ordinance adopted the *Miller* definition. Professor Schauer has stated:

> But now, after *Miller,* it is clear that hard-core pornography may include material which does not depict sexual acts, and "lewd exhibition of the genitals" is specifically included. This should be interpreted in the light of a number of lower court cases defining hard-core pornography to include photographs which focus on, exaggerate, or emphasize the genitalia or "erogenous zones." It is this exaggeration or "highlight" on the genitalia which often distinguishes hard-core pornography from mere nudity.

Schauer at 111–112.

Turner elected to exhibit materials which highlight and amplify female genitalia, one of *Miller*'s specific examples of "hard core." In fact, Turner described the vulva drawing as: "It's supposed to be a very-enlarged portion of the girl's pubic area" and the "tunnel of love" represents "a girl's vagina." Turner's depictions are a form of hard core pornography well within the types of permissibly proscribed depictions set forth in *Miller* and the St. George ordinance. Accordingly, Turner's materials were sufficient to clearly present a jury issue as to obscenity. As promised, I now turn to further consideration of the average person test because the majority has not given proper deference to this test and has substituted their own personal judgments for that of the jury.

## B. The Average Person Test

### 1. Test Applies to Prurient Interest and Patently Offensive Elements

In 1957, *Roth* replaced the "most susceptible" person test of obscenity with the "average person" test. *Miller* reaffirmed this test by reciting *Roth:*

> The basic guidelines for the trier of fact must be: (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest.

*Miller,* 413 U.S. at 24, 93 S.Ct. at 2615 (quoting *Roth,* 354 U.S. at 489, 77 S.Ct. at 489).

The *Miller* Court rejected a national "community standard" as an exercise in futility. In so doing, the Court relied on the dissent of Mr. Chief Justice Warren in *Jacobellis v. Ohio,* 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) which stated:

> It is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City. People in different States vary in their tastes and attitudes, and this diversity is not to be strangled by the absolutism of imposed uniformity.

*Jacobellis,* 378 U.S. at 200, 84 S.Ct. at 1684 (citations omitted).

In accord with the above rationale, the *Miller* Court held "that obscenity is to be

determined by applying 'contemporary community standards', 'not national standards'." *Miller*, 413 U.S. at 31–32, 93 S.Ct. at 2619. *Miller* analyzed this new standard in relation to both the prurient interest and the patent offensiveness tests. Both of those tests require a less rigid standard of review because they are principally questions of fact. The jurors are to apply this standard as would the average person in their community. Accordingly, the jurors' analytical process is as follows: (1) determine, from their own knowledge of the community, the sense of the average person in the community; (2) determine from their own knowledge of the community contemporary community standards; (3) apply those standards to the work in question and make judgments regarding appeal to the prurient interest and patent offensiveness. If these judgments by the jury are in the affirmative, the work is obscene. If either of these judgments is in the negative, the work is not obscene. Thus, only the serious value element of *Miller* presents a question regarding fundamental constitutional rights. *See, e.g.*, Schauer at 125. If the work is obscene, the jury then determines whether it has serious value which would save it. This is done by applying the reasonable person test. *Pope v. Illinois*, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987).

## 2. The Average Person

Who is the mysterious average person? He or she is neither the most immune nor the most susceptible. "[O]bscenity is to be judged according to the average person in the community, rather than the most prudish or the most tolerant." *Smith v. United States*, 431 U.S. 291, 304, 97 S.Ct. 1756, 1766, 52 L.Ed.2d 324 (1977). The *Miller* opinion stated the primary concern in requiring a jury to apply this standard is that the material "will be judged by its impact on an average person, rather than a particularly susceptible or sensitive person—or indeed a totally insensitive one." *Miller*, 413 U.S. at 33, 93 S.Ct. at 2620. I note the continuing emphasis that it is the individual juror who must divine the standards of the average person in the local community.

Because this factual judgment is to be exercised by the peer juror, the prosecution need not produce "expert" witnesses to testify as to obscenity. *Kaplan v. California*, 413 U.S. 115, 121–22, 93 S.Ct. 2680, 2685, 37 L.Ed.2d 492 (1973). The juror knows as well as any expert who the average person is and what the contemporary community standards are. *See Paris Adult Theater I v. Slaton*, 413 U.S. 49, 56, 93 S.Ct. 2628, 2634, 37 L.Ed.2d 446 (1973). The Supreme Court has stated:

> A juror is entitled to draw on his own knowledge of the views of the average person in the community or vicinage from which he comes for making the required determination, just as he is entitled to draw on his knowledge of the propensities of a "reasonable" person in other areas of the law.

*Hamling v. United States*, 418 U.S. 87, 104–05, 94 S.Ct. 2887, 2901, 41 L.Ed.2d 590 (1974), *quoted in Smith*, 431 U.S. at 302, 97 S.Ct. at 1764.

This standard requires each juror to tap his or her knowledge of his or her community in deciding what obscenity conclusion the average person in the community, applying contemporary community standards, would reach in a particular case. Thus, the appellate judge has a formidable, if not impossible task, in second guessing the juror's personal draw on his or her "knowledge of the community." How does the appellate judge divine the sense of the average person in a distant community where the appellate judge does not reside or has little, if any, personal knowledge of community mores on which to draw? Expert witnesses? Not required. "[I]n 'the cases in which this Court has decided obscenity questions since *Roth*, it has regarded the materials as sufficient in themselves for the determination of the question.'" *Kaplan*, 413 U.S. at 122, 93 S.Ct. at 2685 (quoting *Ginzburg v. United States*, 383 U.S. 463, 465, 86 S.Ct. 942, 944, 16 L.Ed.2d 31 (1966)). How about the local statute? Introduced here. Helpful evidence, but not conclusive. "[T]he local statute on obscenity provides relevant evidence of the mores of the community whose legislative body

enacted the law." *Smith,* 431 U.S. at 308, 97 S.Ct. at 1767. *Smith* held, as did *Miller,* that the issues of prurient interest and patent offensiveness "are fact questions for the jury, to be judged in the light of the jurors' understanding of contemporary community standards." *Id.* at 300–01, 97 S.Ct. at 1763–64. Thus, we see that the jury is uniquely qualified to exercise this particular judgment, i.e., the average person applying contemporary community standards. They must "consider the entire community and not simply their own subjective reactions or the reactions, of a sensitive or of a callous minority." *Id.* at 305, 97 S.Ct. at 1766. And in this case, my appellate colleagues have little evidence of local community standards other than the juror's judgment which has been exercised.[5] Here, the basic evidence of community mores was each juror's personal knowledge of local standards and the St. George ordinance. The St. George ordinance contains the *Miller* definitions of hard core obscenity. The ordinance is substantial evidence of a community standard that genitalia will not be lewdly depicted and displayed to the public. Turner elected to exhibit genitalia, as proscribed, to the unwarned members of the public including juveniles who entered his place of business. His public exhibition of hard core materials created questions for the jury regarding prurient interest and patent offensiveness.

The jury applied the "average person" test under contemporary community standards and found in the affirmative. Again, the majority has not definitively answered the question of whether a jury question had been created on these issues. Instead, the majority, without acknowledging the "average person" test simply substitutes their individual judgments for the judgments exercised by the jury and summarily announce their own factual findings (dressed up as conclusions of law) in the negative stating:

> Because we conclude ... that the drawings themselves do not appeal to the prurient interest and are not patently offensive and because the drawings rationally relate to the rest of the collage ... taken as a whole ... we find the drawings are not in violation of the St. George Ordinance.

## TURNER'S WORK "AS A WHOLE"

Since the majority concluded that Turner's work failed the "hard core" requirement, that should have been the end of the opinion, as in *Jenkins v. Georgia,* 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974) on which they rely. Nevertheless, the opinion tries to further save the work from the jury's obscenity determination by analyzing Turner's work "as a whole."[6]

5. The defense called four witnesses ostensibly to testify regarding community standards. One had purchased some "mens'" magazines at some convenience stores in Washington County. Another had seen "R" rated movies in St. George, including *Sea of Love* and *Skin Deep,* but no "X" rated movies. One indicated that there were literary works available in Southern Utah which contained the "F" word, and the last described the place of nudes in 20th century art. None testified as "experts" nor stated "expert opinions" regarding community standards.

6. The majority tries to save Turner's work from the jury's obscenity determination by relying completely on the curious per curiam case of *Kois v. Wisconsin,* 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972) for its "as a whole" analysis. I observe some problems with this reliance on *Kois.*

First, *Kois* was a pre-*Miller* case. *Kois* is divided into two sections using different analyses to dispose of two separate criminal offenses: (1) an underground newspaper article which included a photo of a nude couple embracing and (2) a book of poems which included a poem describing sexual intercourse.

Second, since *Kois* was a pre-*Miller,* "national" community standards case, the Supreme Court's scope of review was broader than it would be post-*Miller,* applying "local" community standards.

Third, *Miller* requires a different analytical approach than was applied in the sex poem section of *Kois.* There, the Court looked at the "artistic" value of the poem in question and considered it to be in the realm of "serious art." From that premise, the Court decided the dominant theme of the poem did not appeal to the prurient interest. Under *Miller* "serious value" of the work is examined last and only after the work has failed the prurient interest and patent offensiveness tests. If so, "serious value" is examined to determine if the work has value which can save it.

## A. Context or Unit of Perception

Obscenity cases have dealt with a book, a movie, a magazine article, a cartoon, a brochure, each as a unit of perception.[7] What material displayed by Turner is the logical unit of perception? The prosecution offered two separate sheets as units of perception each depicting offensive material. Turner testified that one of the sheets which contained, among other slogans and depictions, the words "Group Sex" and "Eat It, Eat Me" was prepared four years earlier as part of a Halloween motif. Accordingly, it did not bear any time relation or context relation to the other sheet depicting the nude and vulva. Further, Turner's counsel argued to the trial court that the two sheets were "totally" separate and different works. The main opinion disregards Turner's view and identifies Turner's "hard rock record store," including the "collage" of wall hangings, as the unit of perception. I agree with Turner and his counsel that the logical unit of perception is to view each of Turner's sheets as separate "paintings" or works. Turner's painting (sheet depicting the nude female and vulva), described in detail in my "facts" section above, is the work or unit of perception at issue in this case. Thus, the single sheet is the "work" to be "taken as a whole" in the analysis.

## B. Dominant Theme

The question to be asked by trial judge, jury and appellate judge is:

whether the objectionable materials are related to text or other materials which are themselves constitutionally protected, or whether the text [or other materials are] merely asserted as a sham to

attempt to shield commercial pornography in a cloak of legitimacy.

Schauer at 106.

Turner was unable to articulate any text or theme for the materials on his painting exclusive of the nude and vulva. His testimony reveals that he had no clear theme. He was not sure, but he believed his painting "resembles political commentary." Even Turner's brief concedes that the theme of his "bed sheets is admittedly difficult to identify precisely." Thus, the jury, applying the "average person test" could reasonably conclude that the objectionable sexual depictions and descriptions could not possibly relate to the other materials on the sheet because they were themeless, i.e., a diverse collection of ideas. Further, even if the other materials set forth a clear "political" theme, the jury could reasonably conclude that the "sexual" materials had nothing to do with politics. Moreover, since Turner testified that the two sexual depictions were the first materials placed on the sheets (and the other materials added later had no theme or were not related, if they had a theme), the jury could have reasonably concluded that the materials added to the top of the sheet were indeed a sham attempt by Turner to insulate or shield obscene material (the lower half of the sheet) with non-obscene material. Turner could not identify a dominant theme.[8] Since he could not, the jury had a basis on which to conclude that Turner's "themeless" materials were merely a sham attempt to insulate his "objectionable" materials.

This would occur, for example, if the most obscene items conceivable were inserted between each of the books of the Bible. But under existing law, the

7. The trial judge, the jurors and the appellate judges should observe the complete "work" as a unit of perception. *See generally Kaplan v. California,* 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973) (book); *Jenkins v. Georgia,* 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974) (movie); *Penthouse Intern., Ltd. v. McAuliffe,* 610 F.2d 1353 (5th Cir.), *cert. dismissed,* 447 U.S. 931, 100 S.Ct. 3031, 65 L.Ed.2d 1131 (1980) (magazine); *Papish v. Board of Curators,* 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973) (per curiam) (political cartoon); *Hamling v.*

*United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (advertising brochure).

8. The majority creates a "rational relationship" among Turner's diverse "political, philosophical, musical, social and sexual themes" by calling his work a collage. Thus, several entirely unrelated themes are made the "dominant theme" of the majority with the store as the "context." Accordingly, the offensive depictions, as part of the collage, in this large context, are simply meaningless, i.e., not obscene.

judges and juries are able to identify shams in which non-obscene material is used as a vehicle to insulate obscene material. As established in *Ginzburg*, the "taken as a whole" test is not quantitative. Under *Miller*, even one obscene item contained in a work would be sufficient to support a finding that the entire publication is obscene if, "taken as a whole," the publication lacks serious value. The "taken as a whole" test is not inconsistent with the recognition of shams.

*Penthouse Intern., Ltd. v. McAuliffe*, 610 F.2d 1353, 1368 (5th Cir.1980) (footnote omitted).

