PROVO CITY CORPORATION, a municipal corporation of the State of Utah, and Christensen & Griffith Construction Company, Plaintiffs,

v.

STATE of Utah, By and Through its DEPARTMENT OF TRANSPORTATION, Defendant and Appellee,

and

Staker Paving and Construction Company, Defendant and Appellant.

CHRISTENSEN & GRIFFITH CONSTRUCTION COMPANY, and Provo City Corporation, a municipal corporation of the State of Utah, Plaintiffs and Appellant,

v.

STATE of Utah, By and Through Its DEPARTMENT OF TRANSPORTATION, and Staker Paving and Construction Company, Defendants and Appellee.

Nos. 880083, 880097.

Supreme Court of Utah.

June 27, 1990.

Bruce L. Richards, Salt Lake City, for Christensen & Griffith Const.

Gary Gregerson, Provo, for Provo City.

Carman E. Kipp, Salt Lake City, for State of Utah and UDOT.

Robert H. Henderson, Salt Lake City, for Staker Paving.

STEWART, Justice:

Plaintiff Christensen & Griffith Construction Company appeals the grant of summary judgment dismissing its complaint against defendant State of Utah. Defendant and counterclaimant Staker Paving and Construction appeals the grant of summary judgment entered in favor of the State dismissing Staker's counterclaim against the State.

## I. FACTS

Christensen & Griffith contracted with Provo City to construct the East Bay Golf Course. Construction of the golf course began in mid-March of 1984. At approximately the same time, the State began

building two dikes running parallel to and along both sides of Interstate 15 ("I-15"), the major freeway running north and south through Provo. To the east of I-15 lies a range of mountains. Runoff water drains from the mountains and flows westward toward Utah Lake, which lies to the west of I-15.

The East Bay Golf Course is located immediately east of I-15, between the mountains and the freeway. At this location, the roadbed on which I-15 lies acts as a dam or dike, stopping the flow of water from the mountains toward the lake. Because of this condition, several culverts were constructed underneath I-15 to allow water to flow unimpeded to Utah Lake.

As part of the State's diking project in 1984, the culverts under I-15 had to be extended to run under the new dikes. To facilitate the culvert extension, the State's contractor, Staker Paving, built coffer dams. These coffer dams were mounds of earth built around the culverts and the areas into which the culverts would be extended. The water trapped behind the coffer dams was pumped out to create a dry area in which the extensions on the ends of the culverts could be built. However, with the coffer dams in place, the water could not flow through the culverts toward Utah Lake.

Christensen & Griffith alleges that the State and Staker negligently allowed the coffer dams to remain in place after Staker's project was completed, thus damming the water and causing the water level on the east side of I-15 to rise. Christensen & Griffith alleges further that this caused flooding in the area of construction of the golf course. Christensen & Griffith complains that this made their work much more difficult. The work was slowed because of the necessity to work in water, the need to use draglines instead of backhoes, and the need to move material twice.

Plaintiffs Provo City and Christensen & Griffith originally filed this action on May 13, 1985. The State filed an answer and cross-claim against its contractor Staker. Staker filed an answer to the original complaint and to the State's cross-claim and also filed a counterclaim against the State. The State then filed a motion for summary judgment against Christensen & Griffith, Provo City, and Staker based on an argument that the State was immune from suit for flood-related activities under a 1984 amendment to Utah Code Ann. § 63-30-3.

The State's motion was granted as to both of plaintiffs' claims and as to Staker's counterclaim. Provo City and Christensen & Griffith independently appealed the grant of summary judgment in favor of the State. The appeal of Provo City was dismissed after it settled out of court with the State. Staker also appealed the grant of summary judgment in favor of the State.

## II. STANDARD OF REVIEW

A grant of summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Utah R.Civ.P. 56(c); *Ron Case Roofing and Asphalt Paving, Inc. v. Blomquist,* 773 P.2d 1382, 1385 (Utah 1989). When we review a trial court's grant of summary judgment, we analyze the facts and inferences in the light most favorable to the losing party. *Copper State Leasing Co. v. Blacker Appliance & Furniture Co.,* 770 P.2d 88, 89 (Utah 1988). We review the trial court's conclusions of law for correctness. *Madsen v. Borthick,* 769 P.2d 245, 247 (Utah 1988).

## III. ANALYSIS

A. *Statute*

Utah Code Ann. § 63-30-3 (1989) provides as follows:

> Except as may be otherwise provided in this chapter, all governmental entities are immune from suit for any injury which results from the exercise of a *governmental function,* governmentally-owned hospital, nursing home, or other governmental health care facility, and from an approved medical, nursing, or other professional health care clinical training program conducted in either public or private facilities.

The management of flood waters and other natural disasters and the construction, repair, and operation of flood and storm systems by governmental entities are considered to be *governmental functions, and* governmental entities and their officers are *immune* from suit for any injury or damage resulting from those activities.

(Emphasis added.) The State argues that the immunity granted for flood control management is absolute and not subject to the waivers of immunity provided in sections 63–30–5 through 63–30–10.5 of the Governmental Immunity Act. (This argument is hereinafter referred to as the argument for "absolute immunity.") Christensen & Griffith argues that the second paragraph should be read to provide only a qualified immunity for flood control activities, which would make the immunity subject to the waiver provisions. (This argument is hereinafter referred to as the argument for "qualified immunity.") The central issue in this case is the choice between these two positions.

### B. *Legislative History*

The amendment adding the second paragraph to § 63–30–3 was enacted in 1984 as part of Senate Bill No. 97, entitled "Flood Relief–1984." 1984 Utah Laws ch. 33, § 1. This governmental immunity amendment was only a small part of a larger act which provided for various actions by different state agencies to respond to recent flooding and expected flooding. Senator Finlinson, the Senate sponsor of the bill, discussed the purpose of the amendment to § 63–30–3 on the Senate floor:

And what we're really trying to do is encourage the public sector to take action to prevent damage. Salt Lake City is probably one of the, and the Salt Lake County program with the tremendous effort they did through their flood control program. It did cost money but they saved, you know, millions of dollars worth of damage to the private sector and *we want them to be able to make good decisions relative to flood control without worrying about somebody coming back and suing [them]* less [sic] and

second guessing [them] in that very situation.

1984 Senate Bill No. 97, Day 20 (Saturday, January 28, 1984, afternoon session) (emphasis added). This statement indicates that in enacting this amendment, the legislature intended to encourage governmental entities to take action to prevent damage from expected flooding.

Senator Finlinson's statement is consistent with either an absolute or a qualified immunity interpretation of § 63–30–3. The statement is consistent with the qualified immunity interpretation because Senator Finlinson stated that the legislature wanted public sector decision-makers to be able to make decisions relating to flood control without worrying about someone "second guessing" them. This purpose is met by classifying flood control activities as "governmental functions." If flood control is classified as a "governmental function," a governmental entity would be liable for ordinary negligence committed in flood control activities, but would not necessarily be liable for judgment decisions made relative to flood control because of the discretionary-function exception in § 63–30–10(1)(a). Thus, by placing flood control activities in the Governmental Immunity Act, thereby allowing application of the discretionary-function exception, the statute accomplishes Senator Finlinson's stated purpose of allowing decision-makers necessary discretion. However, Senator Finlinson's statement is also consistent with the absolute-immunity interpretation of § 63–30–3, since that interpretation would grant immunity in all situations concerning flood control activities.

### C. *Absolute Immunity*

The State's argument for absolute immunity divides the second paragraph of § 63–30–3 into two phrases. The State argues that the first phrase classifies the management of flood waters as a governmental function ("[t]he management of flood waters and other natural disasters and the construction, repair, and operation of flood and storm systems by governmental entities are considered to be governmen-

tal functions ..."), and the second phrase grants governmental entities immunity when managing flood waters ("and governmental entities and their officers are immune from suit for any injury or damage resulting from those activities"). The second phrase of the paragraph provides that governmental entities "are immune." The State asserts that to read the amendment as subject to the waiver provisions would violate the rule of statutory construction that we are to assume that each term of a statute is used advisedly. *Pate v. Marathon Steel Co.*, 777 P.2d 428, 430 (Utah 1989). The State contends that if the second phrase does not grant absolute immunity to governmental entities, it has no meaning and adds nothing to the statute.

The State's argument is not compelling. Under a similar analysis, if the paragraph provides absolute immunity, then the first phrase of the paragraph is essentially read out of the amendment. The legislature had no reason to define management of flood waters as a "governmental function," as it did in the first phrase, if the second phrase grants absolute immunity for that activity. Defining the management of flood waters as a "governmental function" brings into play the full operation of sections 63–30–5 through 63–30–10.5. Utah Code Ann. § 63–30–3 (first paragraph); *Frank v. State*, 613 P.2d 517, 519 (Utah 1980) (immunity subject to operation of other sections of the act). Granting absolute immunity for the management of flood waters ignores the limits in those sections. If the paragraph is construed to provide absolute immunity, the legislature had no reason to define the management of flood waters as a governmental function. If the paragraph provides absolute immunity for the management of flood waters, then the phrase "are considered to be governmental functions" is essentially read out of the amendment.

The argument for absolute immunity places undue emphasis on the word "immune" in the second phrase of the second paragraph. Such emphasis is misplaced because the language should not be isolated from the rest of the statute or the chapter in this way. *See Bonham v. Morgan*, 788 P.2d 497, 500 (Utah 1989) (statutes should be read in harmony with other statutes in the same and related chapters).

## D. *Qualified Immunity*

We hold that the second paragraph of § 63–30–3 provides only a qualified immunity to governmental entities engaged in flood-related activities. We interpret the statute in this way for several reasons.

### 1. History of amendment

A qualified-immunity interpretation is consistent with the historical background of the amendment. The Governmental Immunity Act was enacted in 1965. 1965 Utah Laws ch. 139. Section 63–30–3 originally granted qualified immunity to entities engaged in the exercise of a "governmental function." In 1978, the legislature amended the section to include governmental hospitals and health care facilities within the qualified immunity. 1978 Utah Laws ch. 27, § 2. In 1981, § 63–30–3 was further amended to include approved medical training programs within the qualified immunity. 1981 Utah Laws ch. 116, § 2. The legislature added the amendment at issue in this case in 1984. 1984 Utah Laws ch. 33, § 1. It is reasonable to believe that when the legislature amended § 63–30–3 in 1984, it understood that it was only doing what it had previously done in 1978 and 1981, that is, providing qualified immunity for one class of activities.

This history must be considered in light of this Court's interpretation of the term "governmental function" prior to 1987. (The legislature expanded the definition of "governmental function" in 1987. Utah Code Ann. § 63–30–2(4)(a); 1987 Utah Laws ch. 75, § 2. This resolved much of the confusion by defining everything a governmental entity does as a "governmental function." However, the legislature in 1984 was not operating under the 1987 amendment.) Prior to 1987, the application of the Governmental Immunity Act involved a two-step process. First, a court determined whether the governmental activity in question was a "governmental

function" for the purposes of the act. If the activity was not a "governmental function," there was no governmental immunity. If the activity was a "governmental function," then the court determined whether a statutory waiver applied. Thus, prior to 1987, the definition of an activity as a "governmental function" was a crucial threshold to the granting of governmental immunity.

This Court clarified the definition of "governmental function" in *Standiford v. Salt Lake City Corp.*, 605 P.2d 1230 (Utah 1980). *See Johnson v. Salt Lake City Corp.*, 629 P.2d 432, 434 (Utah 1981). *Standiford* narrowed the definition of "governmental function" and thus narrowed the class of activities eligible for immunity under the Governmental Immunity Act. *Standiford* stated that a governmental activity was a governmental function only if the activity was "of such a unique nature that it can only be performed by a governmental agency or that it is essential to the core of governmental activity." *Standiford*, 605 P.2d at 1236–37. However, even after *Standiford*, the determination of whether an activity constituted a "governmental function" for the purposes of the Governmental Immunity Act still required a case-by-case analysis.

The case law prior to 1984 was unclear as to whether the management of flood waters would be considered a "governmental function" for the purpose of the Governmental Immunity Act. Before 1984, no case answered that question. *See Sanford v. University of Utah*, 26 Utah 2d 285, 488 P.2d 741 (1971) (did not expressly address definition of governmental function; decided before *Standiford*); *Reeder v. Brigham City*, 17 Utah 2d 398, 413 P.2d 300 (1966) (not decided under Governmental Immunity Act); *Wilkinson v. State*, 42 Utah 483, 134 P. 626 (1913) (decided before Governmental Immunity Act). However, it was clear prior to 1984 that maintenance of a city sewer system was *not* a "governmental function." *Thomas v. Clearfield City*, 642 P.2d 737, 739 (Utah 1982).

Because of *Standiford* and the lack of precedent on this specific issue, the legislature in 1984 could not be certain whether the management of flood waters would be considered a "governmental function" by the courts. Thus, the legislature in 1984 correctly believed that it was restricting the liability of governmental entities for flood control by defining the management of flood waters as a "governmental function" for the purposes of the Governmental Immunity Act. As the law then existed, the legislature could have reasonably believed that providing this definition would act as an encouragement to governmental entities to act to control flooding.

### 2. Placement of provision in the act

Reading the flood control amendment to provide for absolute immunity nullifies the effect of the exception language found in the first clause of the first paragraph of the statute. The flood control amendment was specifically placed in § 63–30–3, see 1984 Utah Laws ch. 33, § 1, which, since its inception in 1965, has granted a general qualified immunity for governmental functions. If the legislature intended to provide absolute immunity, this amendment would not have been placed in a section which has always granted only qualified immunity. The legislature could have just as easily provided that the amendment be placed in a separate section that was free from the exception. This action suggests again that the legislature intended to do what it had done in 1978 and 1981 with the amendments dealing with health care, that is, grant flood control activities a qualified immunity.

### 3. Language of the formal title of the act

The language of the formal title of the act implementing this amendment also implies that qualified immunity was intended. The act's formal title states that what follows is "An act relating to flooding; *clarifying flooding as a governmental function for purposes of governmental immunity....*" (Emphasis added.) Where there is an ambiguity in the body of an act, the title of the act can be considered in ascertaining legislative intent. *See Ameri-*

*can Elec. Power Serv. Corp. v. State*, 619 P.2d 314, 315 (Utah 1980). The title of this act demonstrates that the legislature only intended to clarify that flood control was a "governmental function," thus triggering the waiver provisions of the Governmental Immunity Act.

### 4. Structure of the Governmental Immunity Act

The State's argument for absolute immunity is inconsistent with the structure of the Governmental Immunity Act. The Governmental Immunity Act has a definite structure. Section 63–30–3 provides a qualified or waivable immunity for governmental functions. Sections 63–30–5 through 63–30–10.5 provide the waivers of immunity. Section 63–30–10 states the broadest waiver of immunity. It waives immunity or injury caused by the "negligent act or omission of an employee" in the scope of employment. Utah Code Ann. § 63–30–10(1) (1989). This broad waiver then has thirteen exceptions which restore immunity for the items covered. Utah Code Ann. § 63–30–10(1)(a)–(m) (1989). Nowhere in the act has the legislature given a broad category of activity an immunity that is not qualified by some other part of the act. *See Sanford v. University of Utah*, 26 Utah 2d 285, 289, 488 P.2d 741, 745 (1971) (even the exceptions in § 63–30–10 are subject to the other waivers). Construing the paragraph at issue here to provide absolute immunity would place it in that new category, a category that would provide absolute, unqualified immunity for only the activity of flood control. Other emergency governmental activities, to the extent they are controlled by the statute, are subject to the waivers found in § 63–30–5 through 63–30–9 and 63–30–10.5. *See* Utah Code Ann. § 63–30–10(1)(g), (1); *Sanford*, 26 Utah 2d at 289, 488 P.2d at 745.

Christensen & Griffith's argument for a qualified immunity interpretation finds additional support in § 63–30–4(1), which states that "[i]f immunity from suit is waived by this chapter, consent to be sued is granted and liability of the entity shall be determined as if the entity were a private person." This section expressly states that the waiver provisions apply to all governmental activities. Section 63–30–4(1) does not permit a category of activities to which the waiver provisions do not apply. Thus, interpreting § 63–30–3 to provide absolute, unwaivable immunity is inconsistent with the structure of the Governmental Immunity Act and is directly contrary to § 63–30–4(1).

### 5. Avoiding conflicts with the constitution

█ We have a duty to construe statutes to avoid constitutional conflicts. *State v. Bell*, 785 P.2d 390, 397 (Utah 1989); *Crawford v. Tilley*, 780 P.2d 1248, 1252 (Utah 1989); *Utah State Road Comm'n v. Friberg*, 687 P.2d 821, 831 (Utah 1984) ("[w]e are constrained to construe statutory terms to avoid an unconstitutional application of the statute."); *State v. Lindquist*, 674 P.2d 1234, 1237 (Utah 1983) ("[i]t is the duty of this Court to construe a statute to avoid constitutional infirmities whenever possible."); *see* Sunstein, *Interpreting Statutes in the Regulatory State*, 103 Harv.L.Rev. 405, 468–69 (1989) (gives reasons for rule). The State's argument for absolute immunity may create a conflict with article I, section 22 of the Utah Constitution.

Article I, section 22 of the Utah Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." If the paragraph at issue provides absolute immunity for flood control activities, then it might violate Article I, section 22 any time private property is taken or damaged for public use in the process of the management of flood waters. This constitutional conflict is not a hypothetical problem that could arise in the future; rather, the State's argument for absolute immunity of § 63–30–3 would thrust the Court into the constitutional conflict in this case since Christensen & Griffith argues that the absolute-immunity approach would violate the constitutional taking and due process clauses.

### 6. Nullifies the other waiver provisions

Construing this amendment to provide absolute immunity nullifies several of the

express-waiver provisions of the Governmental Immunity Act. The State's absolute-immunity interpretation would deprive many people damaged by governmental flood control activities of any recovery.

For example, if a contractor contracts with a city to build a dike along a river, the city could ignore the obligation to pay the contractor for the work. Section 63–30–5 waives immunity for suits for contractual obligations. Under the absolute-immunity approach, the waiver in § 63–30–5 would not apply, and the city could argue under the act that it did not have to pay the contractor in a suit for the contract price.

Another example of this problem is found in § 63–30–9. Section 63–30–9 waives immunity for injury caused by dangerous or defective conditions of any "dam, reservoir or other public improvement." *See Parrish v. Layton City Corp.*, 542 P.2d 1086 (Utah 1975) (sewer drain caused flooding); *Sanford v. University of Utah*, 26 Utah 2d 285, 488 P.2d 741 (1971) (construction of parking lot and road caused flooding). Under the State's position, even though the legislature clearly waived immunity for a plaintiff's claim of a defective dam or reservoir in § 63–30–9, that plaintiff would be without remedy under the statute because of the broad interpretation of § 63–30–3. In the end, under the absolute immunity interpretation, the waiver of immunity for dams and reservoirs provided in § 63–30–9 would be read out of the act, since dams and reservoirs are usually built in part for the management of flood waters.

Section 63–30–8 also shows the conflict between the absolute immunity interpretation and the express-waiver provisions. Section 63–30–8 waives immunity for injury caused by defective or dangerous conditions of culverts, tunnels, and bridges. Under the State's absolute immunity interpretation, this waiver of immunity for culverts is also read out of the act in this instance. Thus, even though the legislature has waived immunity for defective culverts in

§ 63–30–8, Christensen & Griffith could not recover against the State for the defective culvert in this case.

Section 63–30–10.5 provides still another example of the odd consequences flowing from the State's position. The legislature attempted to reconcile the tension between the Governmental Immunity Act and article I, section 22 of the Utah Constitution by enacting § 63–30–10.5 in 1987. This section waives immunity for claims under article I, section 22 of the Utah Constitution. However, under the State's absolute-immunity interpretation of § 63–30–3, this waiver is ignored for flood-related governmental activities.

## IV. CONCLUSION

We hold that in amending § 63–30–3 in 1984, the legislature only intended to clarify flood control activities as governmental functions, thus bringing those activities within the Governmental Immunity Act.[1] Thus, the second paragraph of § 63–30–3 is subject to the waiver provisions found in the Governmental Immunity Act. The trial court erred in granting summary judgment to the State against Christensen & Griffith, Provo City, and Staker.

Reversed.

HOWE, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.

HALL, C.J., concurs in the result.

---

**1.** These consolidated appeals were decided as companion cases with *Hansen v. Salt Lake County,* 794 P.2d 838 (1990), which also holds that § 63–30–3 provides only a qualified immunity.