**CITY OF ST. GEORGE, Plaintiff and Petitioner,**

**v.**

**Brent Allen TURNER, Defendant and Respondent.**

**No. 910309.**

Supreme Court of Utah.

Sept. 23, 1993.

Theodore W. Shumway, St. George, for City of St. George.

Alan D. Boyack, St. George and Michael P. Zaccheo, Salt Lake City, for Brent Allen Turner.

## ON CERTIORARI TO THE UTAH COURT OF APPEALS

STEWART, Justice:

This case is here on a writ of certiorari to review the decision of the Utah Court of Appeals in *City of St. George v. Turner*, 813 P.2d 1188 (Utah Ct.App.1991), which reversed a jury verdict convicting Brent Allen Turner of publicly displaying obscene material. We affirm the court of appeals.

A jury convicted Brent Turner, the proprietor of a record shop in St. George, Utah, of displaying obscene material in violation of section 2a(1) of St. George obscenity ordinance No. 2-77-2. Section 2a(1) of the ordinance makes it unlawful for a person to knowingly "[d]istribute, display publicly, furnish or provide to any person any obscene material or performance." Section 1a defines "obscene" as

> any material or performance which, when taken as a whole and considered in the context of the contemporary standards of this community:
>
> (1) Appeals to prurient interest in sex;
>
> (2) Portrays sexual conduct in a patently offensive manner;
>
> (3) Has no serious literary, artistic, political or scientific value.

Section 1e defines "sexual conduct" as the "lewd exhibition of the genitals, including any explicit close-up representation of a human genital organ or a spread eagle exposure of female genital organs."

Patrons of Turner's shop were allowed to use cans of spray paint to spray graffiti-like images and statements on four white bed sheets hung in the shop. The statements and symbols express radical, hostile, or vulgar views about life, death, sex, politics, and societal standards and institutions. However, there is no discernible unifying theme or organizational structure to the drawings and statements. The statements include phrases such as "nuke my ass," "total peace," "fuck authority," "no way out," "fuck you," "group sex," "burn the dead," "eat it eat me," "my right to the world," "your afraid face it," "die for yourself," "live-die," "airborne," "death & destruction," "run and hide death will find you," "sold your soul," "the end," "white flys will eat your flesh," "over kill," "hell house," and "kill for God." The depictions include skeletons, skulls, crosses, an ignited MX missile, peace symbols, grave stones, international prohibitive symbols over the words "life" and "drugs," a smiling face on a bat's body, a gun, a swastika, a door, a mushroom cloud, a moon, the number 13, and a shield with "AA" on it.

The two drawings that form the basis for the obscenity charge are sprayed in the bottom left-hand corner of one of the sheets. The first drawing depicts a naked woman reclining with her legs spread toward the viewer. The woman's pubic area consists of three or four black paint spots. The second drawing appears to be a close-up of the female genitalia, although it may be subject to different interpretations. The two crudely and indistinctly drawn depictions are not readily apparent from among the melange of other random drawings, phrases, and symbols. Above the drawing of the woman are the statements "why not let someone else think for you?" and "tuna factory xxx." To the left of the second drawing is a very small sign stating, "tunnel of love." A faint yellow arrow points from the sign to the female genitalia. In some proximity to the drawings are the statements "keep out," "not yours," and "its mine all mine."

A jury found Turner guilty of violating the St. George City obscenity ordinance, and the judge fined him $300. The court of appeals held that the ordinance was within constitutional limits but, on an "independent appellate review" of the record, held that the drawings, whether viewed individually or together with the other representations on the sheet, did not appeal to a prurient interest in sex or depict sexual conduct in a patently offensive manner.

The City of St. George argues that the court of appeals applied an incorrect constitutional standard and improperly under-

took an independent review of the jury's finding that the drawings were obscene.

## I. STANDARD OF APPELLATE REVIEW

■ To assure that First Amendment values are properly preserved, we apply strict scrutiny when reviewing whether material is obscene and therefore unprotected speech. Thus, the discretion ordinarily accorded to determinations made by a trier of fact is more narrow in an obscenity case. If a trier of fact incorrectly applies obscenity standards and allows constitutionally protected speech to be punished, an appellate court has an obligation to correct the error. *See, e.g., Jenkins v. Georgia,* 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974); *Kois v. Wisconsin,* 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972); *Jacobellis v. Ohio,* 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964); *Penthouse Int'l, Ltd. v. McAuliffe,* 610 F.2d 1353 (5th Cir.), *cert. dismissed,* 447 U.S. 931, 100 S.Ct. 3031, 65 L.Ed.2d 1131 (1980).

■ In *Miller v. California,* 413 U.S. 15, 25, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973), the United States Supreme Court held that although questions of "prurient interest" and patent offensiveness under community standards are "essentially questions of fact," appellate courts have the ultimate power to conduct "an independent review of constitutional claims when necessary."[1] The *Miller* Court looked to *Kois v. Wisconsin,* 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972), which reversed an obscenity conviction by making an independent review of photographs and a poem. The *Kois* court found that the photographs were rationally related to an accompanying article and that the poem was an attempt at serious art whose dominant theme was not an appeal to the prurient interest.

■ The *Miller* opinion also relied on language written by Justice Harlan in *Roth*

*v. United States,* 354 U.S. 476, 498, 77 S.Ct. 1304, 1316, 1 L.Ed.2d 1498 (1957):

Every communication has an individuality and "value" of its own. The suppression of a particular writing or other tangible form of expression is, therefore, an *individual* matter, and in the nature of things every such suppression raises an individual constitutional problem, in which a reviewing court must determine for *itself* whether the attacked expression is suppress[i]ble within constitutional standards. Since those standards do not readily lend themselves to generalized definitions, the constitutional problem in the last analysis becomes one of particularized judgments which appellate courts must make for themselves.

I do not think that reviewing courts can escape this responsibility by saying that the trier of facts, be it a jury or a judge, has labeled the questioned matter as "obscene," for, if "obscenity" is to be suppressed, the question of whether a particular work is of that character involves not really an issue of fact but a question of constitutional *judgment* of the most sensitive and delicate kind.

(Emphasis in original.) Thus, while it is true that judges possess no special expertise that qualifies them to supervise the private morals of the nation or to decide whether a particular speech or communication is good or bad for a local community, judges are better equipped by their training to appreciate and protect First Amendment values. The United States Supreme Court has recognized that judges generally

have a far keener understanding of the importance of free expression than do most government administrators or jurors, and they have had considerable experience in making value judgments of the type required by the constitutional standards for obscenity. If freedom is to be preserved, neither government censorship experts nor juries can be left to make the final effective decisions restraining free expression. Their deci-

---

**1.** Greater judicial scrutiny is especially required when reviewing the artistic, political, or scientific value of a work. The Supreme Court has stated that whether a work lacks such value is a

determination "particularly amenable to appellate review." *Smith v. United States,* 431 U.S. 291, 305, 97 S.Ct. 1756, 1766, 52 L.Ed.2d 324 (1977).

sions must be subject to effective, independent review, and we know of no group better qualified for that review than the appellate judges of this country under the guidance of the Supreme Court.

*Jacobellis v. Ohio,* 378 U.S. 184, 188 n. 3, 84 S.Ct. 1676, 1678 n. 3, 12 L.Ed.2d 793 (1964) (quoting Lockhart & McClure, *Censorship of Obscenity: The Developing Constitutional Standards,* 45 Minn.L.Rev. 5, 119 (1960)).

Because of the fundamental constitutional values at stake, the Supreme Court has rejected the "contention that a jury finding of obscenity *vel non* is insulated from review so long as the jury was properly instructed and there is some evidence to support its findings." *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 506–07, 104 S.Ct. 1949, 1963, 80 L.Ed.2d 502 (1984). Rather, the Court has held that "substantive constitutional limitations govern." *Id.*

■ In this case, it follows that the court of appeals properly undertook an independent review of the jury's ruling. Whether the court of appeals correctly applied the constitutional test set out in *Miller* to the facts of this case is the issue we now address.

## II. ELEMENTS OF OBSCENITY

■ Obscenity is not protected under the Free Speech Clause of the First Amendment to the United States Constitution. *Miller v. California,* 413 U.S. 15, 21, 93 S.Ct. 2607, 2613, 37 L.Ed.2d 419 (1973); *Roth v. United States,* 354 U.S. 476, 484–85, 77 S.Ct. 1304, 1308–09, 1 L.Ed.2d 1498 (1957). *Miller* established a three-part test for determining whether material is obscene and thus falls outside the protection of the First Amendment:

(a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest;

(b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Miller,* 413 U.S. at 24, 93 S.Ct. at 2615 (citations omitted). To regulate or prohibit publication of speech, the government must prove all three parts of the *Miller* test. *United States v. Various Articles of Obscene Merchandise, No. 2102,* 709 F.2d 132, 135 (2d Cir.1983).

■ Material that deals with sex, even though exactly and forthrightly, is not necessarily obscene. "[T]he portrayal of sex, e.g., in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press." *Roth v. United States,* 354 U.S. 476, 487, 77 S.Ct. 1304, 1310, 1 L.Ed.2d 1498 (1957). Customary standards of taste, propriety, and social convention do not define the line between obscenity and constitutionally protected speech. Even vulgar, crude, and degrading material does not fall outside First Amendment protection unless something more is shown. *State ex rel. Collins v. Superior Court,* 163 Ariz. 246, 787 P.2d 1042, 1048 (1986). Thus, even though most people would likely consider the figures on the bed sheets that formed the basis of the prosecution to be crude and vulgar, and even though the statements and symbols on the four bed sheets, taken as a whole, have no "serious literary, artistic, political or scientific value" within the meaning of the St. George ordinance, that alone does not make the drawings legally obscene.[2]

The Utah Court of Appeals found the first *Miller* standard dispositive as to whether the figures on the bed sheets were obscene, that is "whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest." The court held that the depictions did

---

**2.** The ordinance was clearly drafted to incorporate the elements of obscenity law set out in *Miller.* For that reason, we construe the terms of the ordinance in light of *Miller* and its progeny.

not appeal to the prurient interest as a matter of law. We agree.

■ The definition of "prurient interest" raises conceptual and definitional difficulties. The legal definition is not based on, or even necessarily congruent with, any particular person's definition. Although contemporary community standards provide the legal point of reference for determining prurient interest, mere nudity or simple reference to or discussion of sex does not, as a matter of law, appeal to the prurient interest. A prurient interest in sex under the law is not the same as a candid, wholesome, or healthy interest in sex. *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 498, 105 S.Ct. 2794, 2798–99, 86 L.Ed.2d 394 (1985); *State v. Bartanen,* 121 Ariz. 454, 591 P.2d 546, *cert. denied,* 444 U.S. 884, 100 S.Ct. 174, 62 L.Ed.2d 113 (1979).

■ The first *Miller* standard requires that when determining whether a work appeals to the prurient interest, it must be judged as a whole, and not on the basis of its isolated parts. *Miller,* 413 U.S. at 24, 93 S.Ct. at 2615; *Roth v. United States,* 354 U.S. 476, 489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498 (1957). The context in which the sexual material is presented must also be considered. *See Kois v. Wisconsin,* 408 U.S. 229, 231, 92 S.Ct. 2245, 2245–46, 33 L.Ed.2d 312 (1972).

■ In this case, it is problematic to dignify the bed sheets by calling them a "work." There is no overall theme to the graffiti on the bed sheets. The statements and symbols were apparently rendered by different individuals who were venting whatever thoughts, however base, crude, or unconventional, that came into their minds. The two isolated sexual images do not make the four bed sheets plainly and unmistakably sexual in nature, nor do the other phrases and symbols contribute in any way to an aura of sexuality, prurient or otherwise. Indeed, one does not even see the two sexual drawings without first encountering the overwhelming chaotic jumble of statements and symbols. The two sexual figures constitute a very small part of some fifty phrases, symbols, and figures, and they are the only two that are sexual in nature.

■ Even viewing the two drawings in isolation, we conclude as a matter of law that they do not stimulate a prurient interest in sex. Material does not evoke a prurient interest unless it has the capacity to provoke "sexual responses over and beyond those that would be characterized as normal." *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 498, 105 S.Ct. 2794, 2799, 86 L.Ed.2d 394 (1985). An expression or depiction must at least be erotic in some significant way to the average person, *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), unless it is intended for a sexually deviant group, in which case it is sufficient if the materials appeal to the prurient interest of that group. *Mishkin v. New York,* 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966).

The spray painted drawings of female genitalia at issue here simply are not erotic or sensual. The images are blurry, and one of them is difficult to discern. The two figures have no capacity to titillate or provoke a sexual response from either the average person or any definable group of persons. We agree with Judge Garff of the court of appeals when he wrote:

While the spray painted drawings depict representations of genitalia, the drawings are too crudely rendered to be salacious or titillating or to provoke sexual responses, normal or healthy, much less those that are "over and beyond those that would be characterized as normal." *Brockett,* 472 U.S. at 498, 105 S.Ct. at 2799. "Whatever else may be necessary to give rise to the States' broader power to prohibit obscene expression, such expression must be, in some significant way, erotic." *Cohen v. California,* 403 U.S. 15, 20, 91 S.Ct. 1780, 1785, 29 L.Ed.2d 284 (1971). The arresting officer admitted as much at trial. Even though the drawings are vulgar, offensive, and confrontational, they are too sketchy and abstract to appeal "to a shameful or morbid interest in

sex." *Brockett,* 472 U.S. at 504, 105 S.Ct. at 2802.

*City of St. George v. Turner,* 813 P.2d 1188, 1192 (Utah Ct.App.1991), *see also Brockett,* 472 U.S. at 498, 105 S.Ct. at 2798–99. The statements near the drawings do not make the drawings any more erotic. Except for the small signpost saying "tunnel of love" and a faint arrow pointing from the signpost to the drawing of female genitalia, the other statements surrounding the drawings, such as "keep out" and "its mine all mine," have, at best, an attenuated sexual connotation that some viewers might discern as being related, but others might not. Indeed, these words seem to stand by themselves, like the many other random, unconnected statements on the sheets. The "tunnel of love" sign is an insignificant part of the collage that would not even be noticed by those who did not carefully study the various signs and phrases on the sheets.

 Clearly, *Miller* and its progeny allow government to regulate and ban the commercial exploitation of hard-core pornography. However, the drawings at issue here do not even come close to " 'public portrayal of hard core sexual *conduct* for its own sake and for the ensuing commercial gain.' " *Jenkins v. Georgia,* 418 U.S. 153, 161, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974) (emphasis added) (quoting *Miller,* 413 U.S. at 34, 93 S.Ct. at 2620). First, the drawings were not rendered for the purpose of commercial marketing. Second, mere nudity does not constitute hard-core sexual conduct. *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Jenkins v. Georgia,* 418 U.S. 153, 161, 94 S.Ct. 2750, 2755–56, 41 L.Ed.2d 642 (1974).

 Before "sexual conduct" can be obscene, there must be some degree of sexual activity. The lewd exhibition of the genitals in a manner that suggests some kind of sexual action or conduct may constitute hard-core sexual conduct, but simple nudity

without more is not lewd conduct for the purpose of determining legal obscenity.[3] In *United States v. Palladino,* 490 F.2d 499, 501 (1st Cir.1974), the court held that pictures of naked men that revealed no bodily contact, exotic positions, or sexual arousal did not constitute a lewd exhibition of the genitals. Similarly, in *Huffman v. United States,* 470 F.2d 386, 401 (D.C.Cir. 1971), the court held that the First Amendment protects the depiction of nude women even "where the pictures focus upon the pubic areas and poses are struck in such a way as to emphasize the female genitalia." *See also Penthouse Int'l, Ltd. v. McAuliffe,* 610 F.2d 1353, 1365 (5th Cir.1980).

In *Sovereign News Co. v. Falke,* 448 F.Supp. 306, 396–97 (N.D.Ohio 1977), the court observed:

[T]he line drawn between hard core pornography which is subject to restriction, and the depictions and descriptions of sexual conduct which may not be restricted, depends on the amount of physical activity which is connected with the sexual depiction or description. If the human subject of the depiction or description is engaged in sexual *action,* whether by himself or herself, or with another, then the material is "hard core" sexual conduct, as the Supreme Court used the term, and it may be banned. When, however, the description or depiction is of sexual conduct without a significant *action* element, *i.e.,* the sexual conduct is passive in nature, then the description or depiction is not "hard core" and it may not be banned or restricted.

(Emphasis in original.) A similar observation was made in *People v. Ventrice,* 96 Misc.2d 282, 408 N.Y.S.2d 990, 992–93 (N.Y.Crim.Ct.1978):

Since lewdness cannot be presumed from the mere fact of nudity, there must be a showing of lewd conduct from which the intention to act in a lewd manner can be drawn....

---

**3.** Lewd conduct by persons exposing themselves in public can be punished because that conduct is not speech. The power to regulate lewd conduct itself is broader than the power to regulate

"depictions or descriptions of the same behavior." *Miller,* 413 U.S. at 26 n. 8, 93 S.Ct. at 2616 n. 8.

Where genitalia have been graphically portrayed, together with some indication of sexual activity, e.g., sexual intercourse, masturbation or sodomy, absent social justification or excuse, the material in question has been held obscene. However, the graphic representation of genitalia, without more, is not a violation of the obscenity statute.... It is [the] graphic depiction or simulation of sexual conduct that establishes the line beyond which lies obscenity.

(Citations omitted); *see also People v. Heller*, 33 N.Y.2d 314, 352 N.Y.S.2d 601, 307 N.E.2d 805, 815 (N.Y.1973). Because there is no sexual conduct, express or implied, in either of the two depictions on the bed sheets, they cannot be "lewd" as that term is used for First Amendment purposes.

■ Turner challenges the St. George ordinance as unconstitutional because it makes simple nudity obscene by defining "sexual conduct" as "any explicit close-up representation of a human genital organ or a spread eagle exposure of female genital organs." An ordinance that makes simple nudity obscene may be unconstitutionally overbroad unless it is construed narrowly to pass constitutional muster. *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503–07, 105 S.Ct. 2794, 2801–04, 86 L.Ed.2d 394 (1985); *City of Portland v. Gatewood*, 76 Or.App. 74, 708 P.2d 615, 618 (1985); *State v. Regan*, 97 Wash.2d 47, 640 P.2d 725, 729 (1982).

■ In this case, the ordinance can be construed to be constitutional. Section 1a(2) of the ordinance requires that the work portray "sexual conduct in a patently offensive way." Under section 1e, patently offensive sexual conduct includes any "explicit close-up representation of a human genital organ or a spread eagle exposure of female genital organs." The established rule of construction of legislative enactments is that they should be construed to be constitutional whenever possible. *Provo City Corp. v. State*, 795 P.2d 1120, 1125

(Utah 1990); *State v. Bell*, 785 P.2d 390, 397 (Utah 1989); *see also Greenwood v. City of North Salt Lake*, 817 P.2d 816, 819 (Utah 1991). Because mere nudity is not obscene, section 1e must be construed, as we have done here, to require some express or implied action or conduct in addition to the nudity. Under that construction, section 1e is not unconstitutional on its face.[4]

Affirmed.

HALL, C.J., and HOWE, Associate C.J., concur.

ZIMMERMAN, Justice, concurring and dissenting:

I join in the majority's statement of the law and its analysis of the depictions at issue here. Turner's conviction cannot stand. However, I dissent from the affirmance of the court of appeals judgment that the St. George ordinance is constitutional to the extent that it provides, in section 1e, that the definition of "sexual conduct" includes "any explicit close-up representation of a human genital organ or a spread eagle exposure of female genital organs." This clause I would strike down.

It is true that we usually endeavor to construe statutes as constitutional. Here, the court does this by reading section 1e of the ordinance as requiring that the "representation" be of "conduct," as that term is constitutionally defined. While it is a close call, I conclude that the plain words of section 1e simply do not admit of that interpretation. The section applies to "any" explicit close-up, not only to those that depict sexual conduct.

Given the somewhat farfetched nature of the prosecution here, which suggests something less than a fine sensitivity to First Amendment values, I think it would be more helpful for those who drafted the St. George ordinance and those charged with enforcing it to tell them plainly that the ordinance is unconstitutional to the extent that it attempts to reach "any" depictions

---

**4.** The ordinance at issue does not purport to regulate the time, place, or manner of expressing speech but is solely content-based and prohibits all expressions that fall within its terms.

*See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209, 95 S.Ct. 2268, 2272–73, 45 L.Ed.2d 125 (1975).

elaborated in section 1e. The majority does that, but only in a way that may require further litigation before the message gets through.

DURHAM, J., concurs in the concurring and dissenting opinion of ZIMMERMAN, J.