*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2017 UT 33**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

ERIC LEON BUTT, JR.,
*Appellant,*

*v.*

STATE OF UTAH,
*Respondent.*

No. 20141121
Filed June 19, 2017

On Direct Appeal

Seventh District, San Juan
The Honorable Judge Lyle R. Anderson
No. 130700030

Attorneys:

Troy L. Booher, Beth E. Kennedy, Salt Lake City, and Eugene
Volokh, Los Angeles (pro hac vice), for petitioner

Sean D. Reyes, Att'y Gen., John J. Nielsen, Asst. Att'y Gen., Salt Lake
City, for respondent

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in
which CHIEF JUSTICE DURRANT, JUSTICE DURHAM, JUSTICE HIMONAS,
and JUSTICE PEARCE joined.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1　This case comes to us on appeal from the district court's
denial of Eric Leon Butt, Jr.'s, petition for post-conviction relief.
Petitioner challenges his conviction for dealing materials harmful to
minors, alleging ineffective assistance of trial counsel. The basis for
this claim is trial counsel's failure to assert certain defenses under the
state and federal constitutions—a free speech defense and a "parent-
child communication" defense. The district court denied Butt's
petition.

¶2 We reverse. We conclude that counsel was ineffective in failing to assert a First Amendment defense and that such a defense would have succeeded if it had been raised. We vacate Butt's conviction on this basis (and decline to reach the merits of his other claims).

I

¶3 Petitioner was convicted of two counts of dealing harmful materials to a minor. *See* UTAH CODE §§ 76-10-1201(5)(a), -1206(1)(a). The counts relate to two letters Petitioner sent to his family from jail while awaiting sentencing for theft. While processing Petitioner's first letter for mailing, a jail guard noticed a drawing that concerned him. And he held the letter for review by his jail commander.

¶4 The letter included handwritten notes to Petitioner's wife and five-year-old daughter. Petitioner wrote to his daughter: "Well I know you want me to draw my whole body, but I can't draw very good, so this will have to work." The drawing was an unskilled, hand drawn picture portraying Petitioner naked. While the drawing was rough, it depicted Petitioner's nipples, chest hair, pubic hair, penis, and testicles.

¶5 Three days later, without knowledge that his first letter had been intercepted, Petitioner wrote a second letter. This letter was also intercepted. In this letter, Petitioner again wrote a short note to his daughter: "Hi beautiful girl. I miss you so much. I can't wait to bite your butt cheek. This is what it will look like. I love you."

¶6 Below this note, Petitioner had again roughly sketched a picture of himself naked. This picture was even more rudimentary than the initial drawing. But it portrayed Petitioner's nipples, penis, and testicles. This time, however, he was holding his daughter up with her bottom next to his mouth. A speech bubble from his mouth read: "Oh your butt taste [sic] so good." And a second speech bubble from his daughter's mouth read: "Oouch! Daddy don't Bite so hard Giggle giggle."

¶7 At trial, Petitioner attempted to justify the contents of the first drawing. He testified that prior to his incarceration he had watched a documentary about cave dwellings with his daughter, with cave drawings depicting naked people. Petitioner testified that his daughter had laughed and asked him to draw a picture of himself naked like the cave drawings.

¶8 With respect to the second drawing, Petitioner testified that his daughter likes being tickled. So as part of her bedtime routine he holds his daughter's hands up in the air and nibbles all over her stomach, while she laughs. To escape the tickling, his daughter rolls over from her back to her stomach. At this point, Petitioner teases her, saying "roll back over or I'm going to bite your butt cheek," to which his daughter responds by rolling back over. Petitioner testified that he does not remember ever actually biting his daughter during the routine. Rather, he makes an empty threat so that his daughter will roll back over. Despite Petitioner's explanation, the jury returned a guilty verdict on both counts.

¶9 Petitioner appealed both convictions. His appeal challenged only the sufficiency of the evidence—he did not raise an independent First Amendment defense at trial or on appeal. We affirmed, noting the substantial deference owed to the jury's verdict on a sufficiency of the evidence challenge. Butt then filed a petition for certiorari with the United States Supreme Court. That petition was denied.

¶10 Petitioner next filed a timely petition for post-conviction relief in the district court, alleging ineffective assistance of counsel on two principal grounds. First, Butt asserted that counsel failed to raise an independent free speech defense under the federal or state constitutions. Second, Butt claimed that counsel failed to assert a defense based on federal and state constitutional protections of parent-child communication.

¶11 In response to this petition, the State stipulated to the vacatur of Petitioner's conviction relating to his initial nude drawing. The State also conceded that trial counsel's performance was deficient in failing to raise an independent First Amendment defense. But the State moved for summary judgment with respect to the conviction on the second drawing, arguing that Petitioner suffered no prejudice because the First Amendment defense lacked merit. The State also asserted that trial counsel's failure to raise a parent-child communication defense was neither deficient nor prejudicial because no court has ever expressly adopted such a defense.

¶12 The district court agreed with the State and granted its motion for summary judgment. The court held that Butt suffered no prejudice because his First Amendment defense lacked merit. And it concluded that the parent-child communication defense was too "novel" to fault trial counsel for failing to raise it. On that basis the

court denied Butt's petition for post-conviction relief. Petitioner then filed this timely appeal.

## II

¶13 This case is before us on appeal from the denial of a petition for post-conviction relief on a claim for ineffective assistance of trial counsel. *See* UTAH CODE § 78B–9–106(3). To succeed on this claim, Petitioner must show both that his counsel's performance was constitutionally deficient and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). The State acknowledges that trial counsel was deficient in failing to raise a First Amendment defense. So the only issue presented on appeal is whether Petitioner was prejudiced by this failure.

¶14 The viability of Petitioner's free speech defense turns on the question whether the drawing qualifies as "obscenity." If it does then it falls outside the protection of the First Amendment, and the assertion of a free speech defense would not have altered the outcome of the trial.

¶15 That is the key question presented here. The State contends that Petitioner's drawing meets all of the elements of the doctrine defining the category of materials deemed obscene as to minors. Petitioner disagrees. His position is rooted in the notion that the drawing does not "appeal[] to a prurient interest in sex." *Miller v. California*, 413 U.S. 15, 21 (1973); *see Roth v. United States*, 354 U.S. 476, 487 (1957).

¶16 The U.S. Supreme Court's obscenity jurisprudence has a "somewhat tortured history." *Miller*, 413 U.S. at 20. And the obscenity as to minors doctrine is a particularly underdeveloped corner of this field. So we first provide background on the doctrinal underpinnings regarding state authority to prohibit distribution of obscenity as to minors. We then synthesize the standard for determining whether material appeals to a minor's prurient interest in sex. And we conclude that under this standard, Petitioner's

drawings did not appeal to the prurient interest in sex of his five-year-old daughter.[1]

A

¶17 The United States Constitution prohibits any law "abridging the freedom of speech." U.S. CONST. amend. I; *see also Miller*, 413 U.S. at 19–20 (acknowledging that "the First Amendment [is] applicable to the States through the Fourteenth Amendment"). This protection extends to "[a]ll ideas having even the slightest redeeming social importance—unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion." *Roth*, 354 U.S. at 484. But even the sweeping protection of the First Amendment has limits. "[I]mplicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance." *Id.* And in *Roth v. United States*, the court first identified this conclusion as rooted in the original meaning of the First Amendment. *See id.* at 482–84. The *Roth* court observed that "[t]he guaranties of freedom of expression in effect in 10 of the 14 states which by 1792 had ratified the Constitution, gave no absolute protection for every utterance." *Id.* at 482 (footnote omitted). "As early as 1712," the court noted, "Massachusetts made it criminal to publish 'any filthy, obscene, or profane song, pamphlet, libel or mock sermon' in imitation or mimicking of religious services." *Id.* at 482–83 (citation omitted). Relying on this and other evidence in the historical record, the court concluded that "[a]t the time of the adoption of the First Amendment . . . there is sufficiently contemporaneous evidence to show that obscenity . . . was outside the protection intended for speech and press." *Id.* at 483.

¶18 Yet the *Roth* court also asserted the prerogative of setting standards for defining the category of obscenity. *Roth* endorsed the following jury instructions given by the district court in that case:

> The test is not whether [the material] would arouse sexual desires or sexual impure thoughts in those comprising a particular segment of the community, the

---

[1] Because we reverse Petitioner's conviction on this basis, we decline to reach the merits of his arguments under the state constitution. And we likewise do not address whether there is a parent-child communication exception to the doctrine of obscenity as to minors.

young, the immature or the highly prudish or would leave another segment, the scientific or highly educated or the so-called worldly-wise and sophisticated indifferent and unmoved.

The test in each case is the effect of the book, picture or publication considered as a whole, not upon any particular class, but upon all those whom it is likely to reach. In other words, you determine its impact upon the average person in the community. The books, pictures and circulars must be judged as a whole, in their entire context, and you are not to consider detached or separate portions in reaching a conclusion. You judge the circulars, pictures and publications which have been put in evidence by present-day standards of the community. You may ask yourselves does it offend the common conscience of the community by present-day standards.

In this case, ladies and gentlemen of the jury, you and you alone are the exclusive judges of what the common conscience of the community is, and in determining that conscience you are to consider the community as a whole, young and old, educated and uneducated, the religious and the irreligious—men, women and children.

*Id.* at 490 (internal quotation marks omitted).

¶19 For years after the *Roth* decision, the court struggled to define the proper scope of this formulation of the obscenity doctrine. *See Miller*, 413 U.S. at 18–23. In *Miller v. California*, the court revisited *Roth* and identified new standards to govern state obscenity statutes. *Miller* first required states to adopt a statutory definition of obscene material. *See id.* at 23–24. It then required states to incorporate the following standards into their obscenity statutes:

A state offense must . . . be limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value.

*Id.* at 24.

¶20 This framework now governs the constitutionality of state obscenity offenses covering distribution of materials to adults. Yet there is ambiguity in the framework's application to materials distributed to minors. In the time between *Roth* and *Miller*, the court held that states have authority to "adjust[] the definition of obscenity" when regulating distribution of sexual materials to minors. *See Ginsberg v. New York*, 390 U.S. 629, 638–39 (1968). Under *Ginsberg*, states may assess the "appeal" of sexual materials "in term[s] of the sexual interests" of minors. *Id.* (internal quotations omitted). In light of its timing, the *Ginsberg* adjustment is understood to relate to the original *Roth* standard. It remains unclear whether the "obscenity as to minors" standard is to be adjusted in relation to this standard alone or whether the adjustment also extends to the *Miller* framework. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 n.10 (1975) ("We have not had occasion to decide what effect *Miller* will have on the *Ginsberg* formulation.").

¶21 Fortunately, *Roth* and *Miller* identify roughly equivalent standards on the question presented here. Both require that "the material taken as a whole appeal to a prurient interest in sex." *Miller*, 413 U.S. at 21; *Roth*, 354 U.S. at 487, 489 ("Obscene material is material which deals with sex in a manner appealing to prurient interest."). That is the central question to be decided here—whether the material provided by Butt to his daughter can be said to appeal to the prurient interest in sex of a minor under governing U.S. Supreme Court precedent.

B

¶22 Governing First Amendment jurisprudence does not provide clear guidance on this issue. It is evident from U.S. Supreme Court precedent that appeal to the prurient interest in sex is assessed in terms of the "intended and probable recipient group." *See Mishkin v. New York*, 383 U.S. 502, 509 (1966). But to date, there is no clear guidance on how this standard should apply when the target audience is a minor of such young age that she may not have developed a capacity for sexual arousal.[2]

---

[2] We acknowledge research indicating that children are born with the capacity for sexual response. *See, e.g.*, CHRISTIANE SANDERSON, THE SEDUCTION OF CHILDREN 63 (2004). But absent exposure to sexually explicit material or conditioning of sexual behavior, any

¶23 Petitioner asserts that a minor's lack of capacity for sexual arousal conclusively establishes that any material distributed to the minor does not, and could not, appeal to the minor's prurient interest in sex. In support of this position, Petitioner cites the high court's repeated statements that "to be obscene 'such expression must be, in some significant way, erotic.'" *See, e.g.*, *Erznoznik*, 422 U.S. at 213 n.10 (quoting *Cohen v. California*, 403 U.S. 15, 20 (1971)).

¶24 We do not think Petitioner's approach is compatible with the caselaw. The term *erotic* is used in the cases to describe the character of a particular sexual depiction, not the capacity for sexual response of the intended audience. When *erotic* appears in the caselaw, it is in contradistinction to "a film containing a picture of a baby's buttocks, the nude body of a war victim, . . . scenes from a culture in which nudity is indigenous," "newsreel scenes of the opening of an art exhibit," or "shots of bathers on a beach." *Erznoznik*, 422 U.S. at 213 & n.10. So the requirement that material be "erotic" is rooted in the notion that not all nudity has sexual appeal. The question goes to the character of the material in the context in which it is presented. It does not require that the recipient be capable of experiencing sexual arousal. To hold otherwise would preclude states from protecting a class of particularly vulnerable and impressionable minors from being exposed to sexually explicit materials. Such an interpretation is inconsistent with U.S. Supreme Court precedent in this field.

¶25 This conclusion is bolstered by the court's statements regarding the underlying rationales for giving leeway to states to adjust the obscenity-as-to-minors standard. In identifying the circumstances in which a minor's rights are not co-extensive with those of adults, the court has said that states "may permissibly determine that, at least in some precisely delineated areas, a child—like someone in a captive audience—is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees." *Id.* at 214 n.11 (quoting *Ginsberg*, 390 U.S. at 649–50 (Stewart, J., concurring)). And "[i]n assessing whether a minor has the requisite capacity for individual choice," the court has indicated that "the age of the minor is a significant factor." *Id.* These statements suggest that a state's power to prohibit distribution of

sexual response in very young children "is innocent and discovery-based, and does not consist of more adult type sexual activity." *See id.* at 67.

sexual material to minors is at its peak when the target audience for the material is very young children. This is incompatible with the notion that the court has pegged the prurient interest test to a minor's capacity for sexual arousal. If that were the inquiry, no adjustment would be needed to protect young children from obscene materials because no materials distributed to them could ever be considered obscene as to minors.

¶26 The requirement that material be "erotic" is accordingly directed only at the question of whether it is aimed in some significant sense at appealing to a minor's interest in sex—not at whether a given minor or class of minors is likely to become sexually aroused upon viewing it. A contrary rule would establish a constitutional right to purvey material aimed at "grooming" a young child as a target for future sexual activity. If Petitioner's approach were the law, then a sexual predator would have a right to show erotic material to a young child with the goal of desensitizing the child to the activity depicted therein—and with an eye toward future sexual (and quite criminal) activity involving that child. Surely the First Amendment does not establish such a right.

C

¶27 For these reasons we reject Petitioner's threshold argument. Yet we nonetheless reverse—and uphold the viability of Petitioner's First Amendment defense—on other grounds.

¶28 Petitioner argues in the alternative that we should conduct an independent review of the record to determine the merits of his First Amendment defense. And he asks us to conclude that his drawing was, as a factual matter, not overtly sexual or sexually suggestive. We find this a close call but ultimately agree.

¶29 We agree, as a threshold matter, with the standard of review proposed by Petitioner. The First Amendment defense at issue involves a mixed determination of law and fact. And we have recognized that "while it is true that judges possess no special expertise that qualifies them to supervise the private morals of the nation or to decide whether a particular speech or communication is good or bad for a local community, judges are better equipped by their training to appreciate and protect First Amendment values." *City of St. George v. Turner*, 860 P.2d 929, 932 (Utah 1993). With this in mind, we have held that appellate courts are to conduct an independent review of the record to judge the merits of a First Amendment defense in an obscenity action, yielding no deference to

the jury's verdict or the district court's conclusions on underlying mixed questions of law and fact. *See id.* (reviewing United States Supreme Court precedent and concluding that on appeal from an obscenity conviction the appellate court conducts independent review of the jury's determination to ensure the constitutional standard was properly applied). We apply that standard here, and reverse the district court's decision concluding that Petitioner's First Amendment defense would not likely have succeeded if it had been asserted at trial.

¶30  The jury returned a general verdict in Petitioner's underlying trial. It accordingly made no findings of fact. The same holds in the district court proceedings on post-conviction review—that court made no express findings of fact in its review of Petitioner's First Amendment defense. For those reasons we need not decide here whether we owe any deference to a jury's or lower court's purely factual findings. All we have before us are *mixed findings*—the ultimate application of legal standards to the particular facts of this case. And we have previously held that no deference is owing to those sorts of findings. *See id.*

¶31 On independent review, we conclude that Petitioner's drawing was not aimed at appealing to an interest in sex. This decision rests on our independent factual conclusion that the drawing at issue is so rudimentary that taken as a whole—including the context of Petitioner's unrebutted testimony about his routine with his daughter—it does not depict a sexual act. And we likewise conclude that the drawing is not sexually suggestive.

¶32  An appeal to the prurient interest in sex of a five-year-old is not a particularly high bar. A prurient interest in sex is one that is a "shameful or morbid." *See, e.g.*, *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985). And in the context of obscenity as to minors, this assessment is judged in light of the minor's age. *Cf. Erznoznik*, 422 U.S. at 214 n.11 ("In assessing whether a minor has the requisite capacity for individual choice the age of the minor is a significant factor."). While a five-year-old likely does not experience sexual arousal,[3] material can still generate a desire to engage in sexual relations. Whether that desire stems from curiosity, conditioning, or

---

[3] *But see supra* note 2.

otherwise, it may cross the prurient interest line. Perhaps it could be said that a five-year-old's present desire to engage in any form of sexual activity is prurient. At a minimum, however, it can be said that this standard is met with respect to material that is aimed at appealing to a young child's interest in engaging in sexual activity with a parent (or any adult); such activity is criminal, and thus easily deemed "shameful or morbid."

¶33 The State insists that this is precisely what Petitioner's drawing entices. In the State's view, Petitioner's drawing appeals to the prurient interest in that it piques his daughter's curiosity as to sexual conduct that is shameful or morbid: It makes sexual conduct that is shameful look positive, wholesome, or enticing. In the State's view the drawing does this in at least two ways. First, it is a communication between father and daughter. The drawing is thus imbued with the trust and good-will inherent in the parent-child relationship, coloring shameful sexual conduct in a wholesome light. Second, the depiction itself portrays Petitioner's daughter laughing and giggling while Petitioner, in the nude, bites his daughter's bottom.

¶34 The State's premises are hard to quarrel with. If we viewed the drawing as depicting sexual conduct between Petitioner and his daughter we would have little difficulty agreeing with the State. But on balance, and in light of the context given to the drawing by the only testimony on the matter presented at trial, we view the drawing differently. We do not view the drawing as portraying a sexual act.

¶35 Although the drawing clearly depicts Petitioner naked, it is unclear whether it shows him biting his daughter or simply holding her in the air and joking about doing so. It is equally unclear whether his daughter is clothed or naked. Importantly, moreover, there is no context in the record to support the State's inferences that sexual conduct is in fact being portrayed.

¶36 We likewise conclude that the intended audience, Petitioner's daughter, would not have perceived the drawings as sexually suggestive. Context is particularly important in this area. And the only contextual evidence in the record is Petitioner's own testimony regarding the cave drawing television program and his bedtime routine with his daughter. We have little way of knowing whether Petitioner's testimony was truthful. Perhaps the State is right to be skeptical about the explanation offered by Petitioner. But the problem is that we have no contrary evidence before us—no

indication on the record to give a different context to the drawing, and no basis for the conclusion that Petitioner's explanation was fabricated. We give little weight to Petitioner's story. But we do give it some weight, which together with his daughter's young age leads us to conclude that Petitioner's daughter would not have seen the drawing as sexually suggestive.

¶37 We conclude that the drawing is not sexual or sexually suggestive, and accordingly does not appeal to a prurient interest in sex.[4] We reverse the district court on this basis and vacate Petitioner's conviction for dealing in harmful materials to minors.

———————

[4] We caution that this is a close case. We conclude that on the record before us, Petitioner's drawing was so rudimentary that taken as a whole it would not have appealed to any sexual interest of Petitioner's daughter. But context matters. And a contrary decision might be merited in a case involving additional facts evidencing double entendre, an older child more perceptive of sexual suggestion, a context where the intended recipient might perceive a sexual meaning, or a more explicit drawing.